537 So.2d 435 (1988)
Gregory Lamar CHEATHAM
v.
Judy Stokes CHEATHAM.
No. 57821.
Supreme Court of Mississippi.
December 21, 1988.
Edward A. Williamson, Philadelphia, for appellant.
Terry L. Jordan, Herman Alford, Philadelphia, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ZUCCARO, JJ.
*436 DAN M. LEE, Presiding Justice, for the Court:
Gregory Lamar Cheatham appeals the divorce, lump sum alimony and attorney's fees granted in the Chancery Court of Neshoba County, Mississippi, in favor of Judy Stokes Cheatham. He assigns four errors:
I. The Honorable Chancellor Committed Reversible Error by Granting an Award of Lump Sum Alimony to the Appellee.
II. The Honorable Chancellor Committed Reversible Error in Awarding Lump Sum Alimony in the Amount of $40,000 to the Appellee.
III. The Honorable Chancellor Committed Reversible Error in Awarding Attorney's Fees to the Appellee.
IV. The Honorable Chancellor Committed Reversible Error in Awarding a Divorce to the Appellee on the Grounds of Uncondoned Adultery.

FACTS
Gregory L. Cheatham and Judy Stokes Cheatham were wed September 6, 1974. They lived together until Judy moved out on August 2, 1985. There were no children, but as will be seen, the subject of children caused friction. Judy's complaint for divorce alleged uncondoned adultery on the part of Gregory. In the alternative, Judy alleged irreconcilable differences. Gregory answered denying the adultery charge and alleged in a cross-complaint irreconcilable differences.
The two major factual disputes at trial concerned 1) whether Judy condoned the adultery and 2) the value of Gregory's business interests, mostly a convenience store he owned jointly with his mother.
Gregory admitted having sexual intercourse outside the marriage while married to Judy. Judy's proof tended to show at least two adulterous episodes on June 30, 1985, and July 13-14, 1985, with a divorcee and mother of a child, who was subpoenaed but did not appear to testify.
Judy testified that prior to June 30, 1985, she heard rumors from friends and relatives that Gregory was having an affair. She heard rumors in August 1983 and in April 1984, and confronted Gregory both times but he denied the affair. Only the second time did Judy's informer mention the name of Gregory's partner. Then, in April 1985, Judy's mother told Judy that a friend told her of Gregory's infidelity with the same named partner. This time, Judy again confronted Gregory and he again denied it. Judy, however, left that Friday and did not return home until the following Monday. She spoke with a lawyer who advised her she needed proof of the adultery, and she then sought the aid of a private investigator.
Judy's brother Jimmy assisted the investigator, and the week following June 30, 1985, Jimmy brought pictures linking Gregory and Vicki to a rendezvous at a camp house. Her attorney told her that one incident might be explained and that she needed more proof. Judy continued to sleep in Gregory's bed, though she testified she did not engage in sexual intercourse with Gregory while Jimmy and the investigators gathered more evidence.
July 13, 1985, a Saturday, investigators followed the partner to a motel where she was later joined by Gregory. She and Gregory stayed at the motel that night and into the next afternoon. Investigators testified they took up observation in the adjoining room and heard moaning and groaning through the walls on several occasions.
The record is unclear exactly when Judy learned of this subsequent transgression, but it appears she did not learn of it until July 30, 1985. She moved out August 2, 1985.
She testified that Gregory never admitted his illicit affair, and she never encouraged him to see another woman. Even after the June 30 meeting, when she first received some tangible proof of the affair, she continued to live with and sleep in the same bed with Gregory in order to obtain more proof. Judy testified that she did not have sexual intercourse with Gregory after June 30, 1985, though Gregory never tried to have relations during this time.
*437 Judy also acknowledged that the couple's relationship had changed as a result of the inability to have children and Gregory's unwillingness to adopt. Judy and Gregory had seen a fertility expert for several years and Judy had six miscarriages during the marriage.
Gregory testified that he admitted to Judy that he had an affair in April 1985, and Judy seemed more concerned with her mother's knowledge of the affair than with the affair's existence. Gregory also testified that he did have sexual relations with Judy the Wednesday before she moved out.
The couple's financial picture centered around Cheatham's Mini Mart, owned jointly by Gregory and his mother, Roma. At the time they were married, Gregory had a job with U.S. Motors, but he was soon laid off. He received unemployment compensation for several weeks and then worked almost two years with the Kemper County Employment Security Commission office before opening the store in October 1977. Gregory originally agreed to start the store with another man, Marshall Fulton. Without Judy's consent or knowledge, Gregory and Fulton bought the property for $3,000 and jointly obtained a loan. Before the store could be completed, however, Fulton realized it would not be profitable enough for both partners and offered to buy out Gregory or sell out to him. Roma Cheatham, mother of Gregory, then bought the other half of the business. Roma and Gregory paid off the old loan and arranged new financing.
Of course, with any new business, it did not turn a profit immediately. Judy's salary provided the major income source to the family during Gregory's unemployment and the beginning period of the store. Judy continued to work at the hospital until 1979 when she took a job with the Kemper County Health Department. She continued to receive raises and by trial her annual income was $18,000.
The couple's expenses were few during this period, however. For nine of the eleven years of the marriage the couple lived rent-free in a home owned and furnished by Judy's mother. After the store opened, Greg brought home most of the groceries from the family store. Judy also filled up her car at the store, but did not pay for the gas. Sometimes she would settle up at the end of the month, but not always.
Judy contributed about $1,000 a year to the state retirement fund in her name. She received virtually all the couple's personal effects by agreement; thus, little evidence of its value appears in the record.
Judy also helped around the store, as much as eight hours a week at first, but gradually she worked fewer hours which declined to almost nothing the last couple of years. Gregory testified that Judy had no obligation to work and her help was not needed.
The store did become profitable quickly, though there was confusing evidence of exactly how much Gregory's interest was worth. In 1978, the first full year the store operated, Gregory took out income of $13,537.47. Gregory took out $29,430 in income in 1984. In 1985 Gregory testified he took out $18,000, but his income tax return for 1985 reflected partnership income of only $7,771. Gregory offered some unclear explanation about a credit investment for this discrepancy and said his accountant could explain it. The accountant was not called to testify and the 1985 partnership income return was not introduced.
There was little evidence of the Mini Mart's net worth. As noted, no 1985 financial statement appears in the record; however, the 1984 partnership income tax return lists total assets of $73,914 and total liabilities of $25,124, for a net capital worth of $48,790. In his answer to interrogatories, Gregory listed the insured value of the store at $88,000, and listed a loan debt of $32,000 to the Commercial Bank of Dekalb.
Gregory did testify that recently profits were down at the store because he had to cut prices to meet increased competition.
In addition to the Mini Mart, Gregory was a farmer and cattle rancher. Gregory originally borrowed $21,000 from FHA to finance his cattle endeavor. In 1985 Gregory *438 owned 213 cattle, mostly calves. By trial he had sold 99, leaving him with 114. He owed $14,000 on the loan at trial. Gregory testified, however, that the farming and cattle operation never paid its way. Gregory's income tax return noted a $5,109 farming loss in 1985. In 1984 Gregory reported a farm loss of $8,672.24.
At the conclusion of the trial, the chancellor found that Judy did not condone the adultery by sleeping with Gregory when there "was no resumption of marital cohabitation and the parties remained strangers to each other in the marriage bed... ." He thus found that Judy Cheatham was entitled to a divorce on the grounds of adultery.
Based on Judy's plea for an equitable division of property, the chancellor awarded her lump sum alimony of $40,000, payable in five annual installments of $8,000 beginning July 1, 1986. The chancellor based this finding on the fact that the store was the "only property right of any substantial value" to which Judy had contributed by supporting the family and by working in the store at various times. The chancellor also awarded attorney's fees to Judy in the amount of $1,700. The chancellor entered judgment accordingly, and Gregory timely perfected this appeal.

I.

Did the Chancellor Err in Awarding Lump Sum Alimony?

II.

Was the Chancellor's Alimony Award Excessive?
Gregory argues that the chancellor erred in awarding Judy lump sum alimony of $40,000. This Court has addressed large lump sum alimony awards and has considered several factors:
1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984);
2) A long marriage. Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss. 1973); Tutor and Schilling, supra;
3) Where recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, Tutor and Schilling, supra;
4) Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
A closer analysis of these cases, however, reveal that the single most important factor undoubtedly is the disparity of the separate estates.
In Tutor, Mrs. Tutor apparently had no substantial assets other than Mr. Tutor's coin collection and a $20,000 insurance policy. Mr. Tutor, on the other hand, had total assets of between $900,000 and $1.4 million. The Court in Tutor increased the lump sum alimony award on appeal to $150,000.
In Schilling, Mr. Schilling had an estate with a net worth of not less than $750,000, compared with Mrs. Schilling who had no real assets of her own and whose income did not meet her expenses. A lump sum award of $240,000 was affirmed in this Court.
In Jenkins, the Court reversed and remanded an inadequate award of lump sum alimony in light of the husband's admitted $800,000 net worth acquired during the marriage and the wife's lack of any appreciable assets other than a one-half interest in the marital residence.
In Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982), this Court held that an award of 10% of the husband's net worth would not be inappropriate where the husband's net worth was over $1 million and the wife had no apparent assets other than a one-half interest in the marital residence and some certificates of deposits totalling about $10,000. At the time of trial Mrs. Reeves had no job, though she had professional training and could find adequate employment. Mrs. Reeves worked solely for her husband only for short periods during the marriage, but contributed capital to Mr. Reeves' real estate ventures.
*439 In Clark v. Clark, 293 So.2d 447 (Miss. 1974), Mrs. Clark worked solely for her husband for approximately eleven of the couple's twelve years of marriage. The wife had no apparent assets and the Court reversed for a determination of a fair amount of lump sum alimony to allow her to share in the jointly-accumulated assets which apparently totalled somewhere around $164,000.
More recently, in Skinner v. Skinner, 509 So.2d 867, 869 (Miss. 1987), this Court affirmed a lump sum alimony award of $75,000 where the husband's net worth was well over $700,000 and the wife's net worth was approximately $40,000, that being her one-half interest in the family residence. The couple had been married 27 years.
None of these cases suggest what, if any, lump sum amount might be proper where there is little difference between the separate estates of the husband and wife.
The proof in the case at bar suggests that even taking the most liberal evidence of the Mini Mart's net worth, $88,000 (the insured value), less the remaining loan debt of $32,000, for a total of $56,000, Gregory's net worth would only be one-half, or $28,000. Even assuming Judy has no appreciable assets, this amount is a much smaller disparity than this Court has dealt with previously.
However, this case is more similar to Tutor in that Mrs. Tutor remained employed throughout the couple's married life. The Court noted, "It is uncontroverted that throughout their married life Emogene Tutor worked and provided income for herself and her family and contributed to the financial status of Forrest Tutor and the family." Tutor, 494 So.2d at 363. Though she had no assets, it does not appear that Mrs. Tutor directly contributed in any substantial way to her husband's accumulation of assets. Tutor, then, supports the proposition that a spouse that contributes something to the marriage is entitled to a share of the accumulated wealth. The facts of this case support the chancellor's finding that lump sum alimony is appropriate.
The appropriate amount of the lump sum alimony, however, is a totally separate issue, and one which requires reversal of the $40,000 award.
Even taking the most liberal evidence of net worth, $88,000, Gregory's interest in the Mini Mart would be no more than $28,000. There is nothing in the record which establishes the $88,000 value as unduly conservative; in fact, just the opposite is true. How the chancellor could award the receiving spouse more than that owned by the contributing spouse is a mystery. The chancellor's decision could be supported only if the Court accepts the Mini Mart's value as $88,000 and disregards any store liabilities and Gregory's mother's one-half interest. The record is clear, however, that the store had liabilities and Roma Cheatham did own a one-half interest. This award, therefore, is not supported by the evidence.
Neither does Gregory's income substantiate the amount of lump sum alimony awarded. Gregory's income seems far from steady, since his income from the store declined from nearly $30,000 in 1984 to at most $18,000 in 1985. The only other proof of Gregory's income comes from 1978 when he earned $13,000 from the store.
The proof only shows an average income of roughly $20,000 for these three years. This is only $2,000 more than Judy was earning at the time of trial. Nothing concrete supports an inference that Gregory was hiding assets in order to make his financial picture appear bleak. In fact, Gregory gave a plausible, uncontradicted explanation that his store's profits were down because of increased competition. Taking Gregory's average income for 1984 and 1985, he still only made $24,000. An $8,000 alimony payment would decrease his earnings to $16,000, while increasing Judy's earnings for those five years to $26,000.
Nothing in the record outlines Judy's reasonable and necessary expenses which might support the chancellor's award. The proof supports the inference that Judy could again reside in her mother's house. *440 Judy kept most of the couple's furniture. She would have food and gasoline expenses that previously Gregory met from the Mini Mart; however, these seem to be her only real expenses.
In summary, the proof does not support the amount of lump sum alimony awarded by the chancellor. In this he was manifestly wrong. McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987); Jordan v. Jordan, 510 So.2d 131, 133 (Miss. 1987) (chancellor's decision on alimony will not be disturbed unless manifestly wrong and an abuse of discretion). Since some lump sum alimony would seem warranted under Tutor, supra, the case is remanded for a complete hearing on an appropriate amount.
Gregory finally argues that no lump sum alimony could be awarded since it was not specifically pleaded. Judy did seek periodic alimony and "equitable division" of property but did not seek lump sum alimony. Gregory argues this is insufficient.
While no doubt the better pleading practice is to include a request for lump sum alimony, see Holleman v. Holleman, 527 So.2d 90, 93, there was no surprise or prejudice to Gregory since the record makes clear that the parties litigated the question of alimony and they also litigated to what extent Judy contributed to Gregory's accumulated assets. Therefore, this argument is without merit.

III.

Did the Chancellor Err in Awarding Attorney's Fees?
Counsel for Gregory stipulated to the reasonableness of the amount of Judy's attorney's fees, but did not stipulate to the appropriateness of awarding fees. Here Gregory argues the chancellor erred in awarding any amount of attorney's fees to Judy.
Generally the award of attorney's fees in a divorce case is left to the discretion of the trial court. Holleman v. Holleman, 527 So.2d at 95; Carpenter v. Carpenter, 519 So.2d 891, 895 (Miss. 1988); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982).
However, this Court requires proof of the factors outlined in McKee v. McKee:
In determining an appropriate amount of attorney's fees, a sum sufficient to secure one competent attorney is the criterion by which we are directed. Rees v. Rees, 188 Miss. 256, 194 So. 750 (1940). The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case. (emphasis added)
418 So.2d at 767.
In addition, in Carpenter v. Carpenter, supra, this Court reversed an award of attorney's fees in favor of the wife because of the relative financial conditions of the parties. 519 So.2d at 895. The Court in Carpenter also cited Cameron v. Cameron, 276 So.2d 449 (Miss. 1973), and Nichols v. Nichols, 254 So.2d 726 (Miss. 1971), as supporting the proposition "that if a wife is financially able to pay her attorney, she is not entitled to an attorney's fee award." Id.
The McKee factors stress proof supporting the appropriateness of the amount awarded and thus McKee does not modify the holdings of Cameron and Nichols to a great extent. Gregory essentially argues Cameron and Nichols to this Court. Without more evidence showing Judy's inability to pay, based on Carpenter, Cameron and Nichols the award of attorney's fees was an abuse of discretion requiring reversal of the award.

IV.

Did the Chancellor Err in Finding Sufficient Evidence of Uncondoned Adultery?
Gregory raises two issues here: Connivance and Condonation.

*441 CONNIVANCE
First Gregory argues that Judy's actions amount to connivance which is generally a valid defense. See Bunkley & Morse, Amis' Divorce and Separation in Mississippi § 401 at 140 (1957). Gregory cites this passage:
To connive means to encourage or assent to a wrong by silence or feigned ignorance, and connivance means the act of causing, encouraging or assenting thereto in the same manner. In connivance there is not concert as in the case of collusion, but there must be consent, either express or implied.
What Gregory does not cite is the following passage:

But, "Merely suffering in a single case a wife whom he already suspects of having been guilty of adultery to avail herself to the full extent of an opportunity to indulge her adulterous disposition, which she has arranged without his knowledge does not constitute connivance on the part of the husband, even though he hopes he may obtain proof which will entitle him to a divorce, and purposely refrains from warning her for that reason. He may properly watch his wife whom he suspects of adultery in order to obtain proof of that fact. He may do it with the hope and purpose of getting a divorce if he obtains evidence. He must not, however, make opportunities for her, though he may leave her free to follow opportunities which she has herself made. He is not obliged to throw obstacles in her way, but he must not smooth her path to the adulterous bed." [emphasis added]
Id. at 141.
Here, recall, Judy's investigator had pictures linking Gregory with his partner at a camp house on June 30, 1985. A second indiscretion was noted July 13-14, 1985. Whether waiting for a second indiscretion amounts to connivance would seemingly depend on the facts, and the facts of this case do not support connivance. First, the proof of the initial indiscretion is far from conclusive. The photographs only put the pair together for some two hours. Second, as discussed below, Judy did not condone the adultery; thus, consent would seem less likely to be implied.

CONDONATION
The issue here is whether Judy condoned Gregory's adultery as a matter of law by continuing to live in the same house and sleep in the same bed.
Miss. Code Ann. § 93-5-1 provides that adultery may be a cause for divorce "unless it should appear that it was committed by collusion of the parties for the purpose of procuring a divorce, or unless the parties cohabited after a knowledge by complainant of the adultery." [emphasis added] However, since that section was passed, the Legislature adopted Miss. Code Ann. § 93-5-4 (Supp. 1988), which provides:
It shall be no impediment to a divorce that the offended spouse did not leave the marital domicile or separate from the offending spouse on account of the conduct of the offending spouse.
Gregory argues on the authority of Stribling v. Stribling, 215 So.2d 869 (Miss. 1968), and Thames v. Thames, 233 Miss. 24, 100 So.2d 868 (Miss. 1958), resumption of cohabitation alone condones the marital offense.
In Stribling this Court did state, "Nevertheless, the misconduct on the part of the wife, whether it be adultery or specific acts or cruel and inhuman treatment, was condoned by the husband by resumption of cohabitation with her." Id. at 870.
In Thames this Court characterized misconduct as being condoned "when they resumed their marital relation on that date and lived together as husband and wife until ... the date of their separation." Id. at 29, 100 So.2d at 870.
Obviously, Stribling and Thames were decided prior to adoption of Miss. Code Ann. § 93-5-4 (Supp. 1988). More recently in Wood v. Wood, 495 So.2d 503, 505 (Miss. 1986), this Court stated:
The defense of condonation is recognized in our law. Stribling v. Stribling, 215 So.2d 869, 870 (Miss. 1968); Starr v. Starr, 206 Miss. 1, 39 So.2d 520, 523 *442 (1949). Condonation is the forgiveness of a marital wrong on the part of the wronged party. Condonation may be expressed or implied. Thames v. Thames, 233 Miss. 24, 29, 100 So.2d 868, 870 (1958); Armstrong v. Armstrong, 32 Miss. 279, 283 (1856), and Scott v. Scott, 219 Miss. 614, 629, 69 So.2d 489, 494 (1954).
The mere resumption of residence does not constitute a condonation of past marital sins and does not act as a bar to a divorce being granted. Compare Miss. Code Ann. § 93-5-4 (1972).
This Court in Wood left undisturbed a chancellor's finding that the husband did not condone his wife's adultery, although he resumed cohabitation with her in an attempt to reconcile. The chancellor had apparently relied on the wife's pre-reconciliation adultery, although there was evidence her adulterous ways had continued beyond that date. The Court seemingly agreed that mere cohabitation without resumption of sexual relations might support a finding of uncondoned adultery. The Court stated:
Mary's appeal confronts a finding of fact that Grafton J. Wood had not condoned her pre-June 1983 adulterous conduct. Our authority to review such a finding is limited. We may reverse only where there is no substantial evidence in the record consistent with the finding made by the Chancery Court. See, e.g., Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985); Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983). Grafton Wood denies that after the June 1983 hearing he and Mary resumed sexual relations. He further denied that he effected a legal condonation of Mary's prior course of conduct in any other way. Grafton's testimony in this regard is not inherently incredible. The Chancery Court was within its authority to accept this testimony and reject the contrary testimony offered by Mary. Because Mary's pre-June 1983 adultery thus stood uncondoned, the Chancery Court was within its authority in granting Grafton a divorce on grounds of adultery. Miss. Code Ann. 93-5-1 [Second] (1972).
Id. at 505.
As stated in Wood, the lack of condonation is a finding of ultimate fact deserving of this Court's usual deference. The chancellor heard conflicting evidence that Judy and Gregory did not resume sexual relations, and based upon his view of the witnesses, the chancellor's conclusion is beyond this Court's authority to disturb.
Therefore, this assignment of error is without merit.

CONCLUSION
We reverse and remand for a hearing on the amount of the lump sum alimony award, consistent with this opinion, and reverse and render on the award of attorney's fees to Judy. We affirm the chancellor's finding of uncondoned adultery and the granting of the divorce to Judy on the grounds of adultery.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
PRATHER, J., dissents with separate written opinion, joined by ROBERTSON, J.
GRIFFIN, J., not participating.
PRATHER, Justice, dissenting:
Respectfully, I dissent from the majority opinion regarding (1) remand of this case for reconsideration of the amount of lump sum alimony and (2) the reversal of the award of attorney's fees.
Regarding the award of lump sum alimony, I am of the opinion that this award was fully supported in the record. During the ten year marriage of these parties, the contribution of this wife was substantial. Jones v. Jones, 532 So.2d 574 (Miss. 1988). Judy's salary was the source of income during the early years when her husband was unemployed and establishing a business, the Mini-Mart. Her registered nurse license and her income permitted her husband to additionally begin a small herd of *443 cattle. Their residence was owned by her parents and used by them rent free, as was the pasture for the cattle and a tractor as well. Additionally, after Judy's regular nursing hours, on days off, and holidays, she worked at the Mini-Mart to help out. The amount of time would vary. Particularly during the periods when she sustained six miscarriages, she could not work as often.
The chancellor heard all of the proof regarding value of the Mini-Mart business and of the cattle and determined based on disputed testimony its value and her contribution. At the time of trial, the Mini-Mart generated approximately $30,000 income to the husband according to the chancellor's finding. It is my opinion that his finding on disputed testimony is supported in the record and, therefore, is not manifestly in error.
It is noteworthy that Judy asked by equitable division of the property acquired during the marriage and that the chancellor awarded her a division in the form of lump sum alimony of $40,000 payable in five annual installments of $8,000 plus interest, together with a lien on the husband's half interest in the store.
The award of $1,700 attorney's fee to Judy was supported in the evidence by the relative amounts of their present income.
There was no manifest error committed by the chancellor in this case. In the majority opinion this Court is substituting its judgment as a factfinder for the trial court. I disagree, and submit that $40,000 is well supported in the record. Carpenter v. Carpenter, 519 So.2d 891 (Miss. 1988); McKee v. McKee, 418 So.2d 764 (Miss. 1982); Cameron v. Cameron, 276 So.2d 449 (Miss. 1973); Nichols v. Nichols, 254 So.2d 726 (Miss. 1971). Likewise, there was no manifest error in the award of attorney's fees.
Respectfully, I would affirm the Chancery Court in all respects.
ROBERTSON, J., joins this dissent.