977 So.2d 1257 (2008)
Peirce McINTOSH, Appellant
v.
Gay Reed McINTOSH, Appellee.
Gay Reed McIntosh, Appellant
v.
Peirce McIntosh, Appellee.
Nos. 2006-CA-02136-COA, 2006-CA-01762-COA.
Court of Appeals of Mississippi.
March 25, 2008.
*1259 John H. Daniels, Greenville, attorney for appellant.
Edward D. Lamar and Frank J. Dantone, Greenville, attorneys for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. This appeal arises from a judgment of divorce entered by the Washington County Chancery Court in favor of Peirce McIntosh, which was stayed upon motion by Gay Reed McIntosh. Gay appealed initially, and her appeal was assigned cause number 2006-CA-01762. Shortly thereafter, Peirce appealed the chancellor's decision to stay the final judgment of divorce and to reinstate the order of temporary support. Peirce's appeal was assigned cause number 2006-CA-02136 and has been consolidated with Gay's.
¶ 2. Gay asserts (1) that the trial court erred in granting Peirce a divorce on the ground of cruel and inhuman treatment, (2) that the trial court erred in dismissing her complaint for separate maintenance, (3) that the trial court, in dividing the couple's assets, erred in failing to consider Peirce's Public Employees' Retirement System (PERS) account and Peirce's contributions to a deferred compensation plan, (4) that the trial court erred in denying Gay periodic, lump sum, or rehabilitative alimony, and (5) that the trial court erred in awarding Gay only half of her attorney's fees and expenses.
¶ 3. Peirce asserts that the trial court erroneously granted the stay and that the court did not have jurisdiction to reinstate its temporary order.

FACTS
¶ 4. Gay and Peirce were married on June 10, 1978. One child, Jae, was born on October 5, 1989. On April 22, 2005, after almost twenty-seven years of marriage, Peirce moved out of the marital home. On September 9, 2005, Gay filed a complaint for separate maintenance. On the same day, she also filed a motion for separate maintenance pendente lite and a motion for child support pendente lite. Peirce, in turn, filed a petition for divorce and an answer to Gay's complaint. On December 13, 2005, a hearing was held on Gay's motion for separate maintenance *1260 pendente lite and child support pendente lite.
¶ 5. At the hearing, Gay testified that Peirce had moved out of the marital home; however, she did not elaborate on Peirce's motive for doing so. Later, the chancellor asked her whether she had caused Peirce to leave the marital home. Gay responded that she was not aware of anything that she had done that caused Peirce to leave. Gay did not mention that she believed Peirce was having an affair.
¶ 6. Gay testified that she filed a complaint for separate maintenance, rather than a complaint for divorce, because she wished to remain married and that the separation had taken a financial toll on her.[1] Gay also testified that Peirce had been responsible for paying the household bills since 1988 because she had problems managing the couple's finances. Gay admitted to writing checks that were not honored due to insufficient funds. Gay recalled that "he's been doing it pretty much ever since [1988] and he changed everything to him at that point."
¶ 7. Upon further examination by the court, Gay testified that she had not filed an income tax return since 2002. On reredirect examination, Gay testified that, to her knowledge, the same was true for Peirce. On recross-examination, she testified that if Peirce had made payments to the Internal Revenue Service (IRS) the payments would have been for unpaid taxes prior to 2002.
¶ 8. Peirce testified as an adverse witness. He was adamant that he did not leave Gay for Gloria Sample, the curriculum coordinator at the school where he served as principal. He also testified that he had not engaged in sexual relations with Gloria. Peirce stated that he could no longer trust Gay because she had not been honest with him and that she had been financially irresponsible for years. Peirce testified that Gay would tell him that she had paid certain bills when she had not done so and that she would write checks when there was not enough money to cover them.
¶ 9. Peirce stated that he and Gay began to have problems with their income taxes as long ago as 1985. He recalled that when the problems arose Gay was responsible for filing their income taxes but had neglected to do so. Peirce stated that he did not know that the taxes had not been paid because Gay did not give him notices sent by the IRS. Consequently, he did not learn that the taxes had not been paid until the IRS began garnishing his wages. Peirce testified that he hired a certified public accountant to handle the problem; however, he gave Gay the responsibility again about a year later. Thereafter, Gay failed to file income taxes again.[2]
¶ 10. On direct examination, Peirce testified that the primary reason that he left the marital home was because he did not trust Gay anymore. Peirce stated that he and Gay had had problems for years, beginning about ten years into their marriage when he found out that Gay had given birth to a child before they were married.[3] However, Peirce stated that *1261 Gay's mishandling of the marital funds was the primary reason that he left the marital home.
¶ 11. Upon examination by the court, Peirce stated that living with Gay had become very difficult because Gay would fail to pay the mortgage and other bills after he had given her the money to do so, and she had also stolen checks from his checkbook. As a result, he would not leave his checkbook where Gay would have access to it, and he began having his mail delivered to him at work, rather than at home.
¶ 12. On January 16, 2006, the chancellor entered an order for temporary support, overruling Gay's motion for separate maintenance. The chancellor found that although Gay proved that she did not cause Peirce to leave the marital home, she failed to prove that Peirce had willfully failed to support her and Jae during their separation. The court granted Gay's request for child support and ordered Peirce to pay $500 per month, along with certain additional amounts shown on his 8.05 statement that, according to Peirce, he was already paying for Gay's and Jae's support.
¶ 13. On August 8, 2006, a hearing was held on Gay's motion for separate maintenance. Peirce was called as an adverse witness and testified as to what prompted him to leave the marital residence on April 22, 2005. He stated that he and Gay had an argument "after she claimed to have heard a message that was left on his cellular telephone by Gloria. Peirce stated that the argument began when Gay asked him for money but that it escalated when she accused him of having an affair with Gloria.
¶ 14. During the hearing, Peirce related an incident that occurred in June 2005 when he and Gay spent the night at his mother's home in Armory, Mississippi, before traveling to a conference on the Mississippi Gulf Coast. Peirce denied having sexual relations with Gay during this time; however, Gay recalled that they did. According to Peirce, toward the end of the trip, Gay began to suspect that he was having an affair, which he denied.[4]
¶ 5. Peirce also testified about an incident that occurred after he and Gay had separated. During that time, he was living in a trailer located on a dirt road in Indianola, Mississippi. Peirce testified that on November 22, 2005, he had fallen into a "diabetes sleep" after eating pizza and drinking beer. He was awakened by someone knocking on the trailer, and he called the police to investigate. Peirce stated that when Deputy Doug Grantham arrived, he and the deputy walked around the trailer and the surrounding property but saw no one. Shortly thereafter, Deputy Grantham saw a car parked down the road and went to investigate. Peirce then went to a nearby store to buy water. According to Peirce, when he returned, Deputy Grantham was talking to Gay.[5]
¶ 16. On direct, Peirce testified that Gay often accused him of committing adultery with a maid at the school, assistant teachers, and a custodian. Peirce also testified that between 1991 and 2005 Gay would misappropriate their funds approximately every two months. However, upon *1262 examination by the court, Peirce testified that Gay stopped stealing his checks around 1995.
¶ 17. Gay's version of what occurred the night that Peirce left the marital home differed from Peirce's version. Gay admitted that she listened to a voicemail message that was left on Peirce's cellular telephone by Gloria, but she stated that she did not mention to Peirce that she had heard the message.[6] Gay further testified that she asked Peirce for some money. He responded by telling her that he was leaving because he was "tired of this." Gay stated that as Peirce packed his things she unpacked them. Gay testified that she and Peirce talked for a while, and she tried to convince him that they could work out their problems. During the conversation, Peirce began to feel ill.[7] Gay recalled that "it was like he was having a heart attack or something, you know, because he started sweating and then he got tired." She stated that Peirce was not physically able to leave until around 3:00 a.m, at which time, Peirce went to his car and gave Gay the money she had requested. As he continued to pack his things, Gay asked him whether he was leaving her for Gloria. Gay stated that Peirce told her that he was leaving because he was tired.[8] Gay testified that it was at that point that she told him that she had heard Gloria's message. Gay stated that as Peirce packed his car and attempted to leave, she sat in the passenger seat of Peirce's car. Gay further testified that Peirce tried to push her out of the car and that she hit him. They both started pushing each other and they eventually fell out of the car onto the ground. Peirce left shortly thereafter.
¶ 18. Gay testified that she remained ready and willing to take her husband back and that her willingness to have sexual intercourse during their separation proved this.[9]
¶ 19. On cross-examination, Gay admitted that she had not always been truthful during the course of their marriage. She testified that "in the past" she had (1) taken checks from Peirce's checkbook, (2) taken savings bonds that Peirce had purchased prior to the marriage and forged his signature, (3) failed to pay the rent on an apartment after Peirce had given her the money to do so, and later lied about having made the payments,[10] and (4) purchased items using a credit card only to return the items for cash. Although Gay admitted doing the things mentioned above, she insisted that she always used the money to meet the household needs.
¶ 20. An issue of contention was also Gay's refusal to attend church or social functions associated with Peirce's duties as a high school principal. Gay testified that, prior to September 2005, it had been approximately *1263 ten years since she had attended church with Peirce. We note that at the December 2005 hearing, Gay testified that she had resumed attending church with Peirce in April 2005 but that she had stopped again in either October or November 2005. According to Gay, she stopped attending church with Peirce and Jae because she did not want to impede on the time that Jae spent with his father. Gay also testified that she did not attend school-related functions with Peirce because she often did not have the appropriate attire.
¶ 21. The chancellor entered a bench opinion on October 2, 2006, in which she granted Peirce a divorce on the ground of cruel and inhuman treatment. In her judgment, the chancellor divided the parties' debts and assets, awarded custody of the couple's minor child to Gay, ordered Peirce to pay $1,000 per month in child support, and awarded Gay one half of her reasonable attorney's fees and one half of her expenses. The chancellor also dismissed Gay's motion for separate maintenance pendente lite and child support pendente lite and declined to award Gay alimony.
¶ 22. On October 11, 2006, Gay filed a motion for stay of enforcement of the judgment of divorce and a notice of appeal. On November 1, 2006, the court, sua sponte, modified its final judgment of divorce, asserting that it failed to "consider the nature of the retirement accounts in making its division of the parties' investments and savings and checking accounts." Peirce filed a motion objecting to the modification, and the court later voided the November 1 modification. On December 1, 2006, the court entered an order staying the final judgment of divorce until issuance of the Mississippi Supreme Court mandate.
¶ 23. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Habitual Cruel and Inhuman Treatment
¶ 24. "This Court will not reverse a chancellor's decree of divorce unless it is manifestly wrong as to law or fact." Fisher v. Fisher, 777 So.2d 364, 367(¶ 8) (Miss.2000). Gay argues that the chancellor erred in granting Peirce a divorce on the ground of habitual cruel and inhuman treatment and relies on several cases to show that Peirce is not entitled to a divorce on the ground of cruel and inhuman treatment based on her conduct.
¶ 25. First, she cites to Marble v. Marble, 457 So.2d 1342 (Miss.1984). In Marble, John Marble appealed the chancellor's judgment denying his request for a divorce on the ground of cruel and inhuman treatment and awarding separate maintenance to Rebecca Marble. Id. at 1342. The Mississippi Supreme Court reversed the chancellor's grant of separate maintenance; however, it concluded that "[w]hile John Marble appears genuinely unhappy in this marriage, in our opinion he has not proved this dissatisfaction is caused by any cruel and inhuman treatment on Rebecca's part." Id. at 1343. The Marble court found no evidence of conduct that could be said to have constituted cruel and inhuman treatment. Id. It appears that the only evidence John presented to support his allegations of cruel and inhuman treatment on Rebecca's part was that they did not share the same religious views and that "she [was] unwilling or unable to be as fastidious a housekeeper and as demonstrative as he would [have] like[d]." Id. Clearly, Gay's conduct, as evidenced in the recitation of the facts, is more egregious. *1264 Thus, we find Gay's reliance on Marble misplaced.
¶ 26. Second, Gay cites Kergosien v. Kergosien, 471 So.2d 1206, 1210 (Miss. 1985) where the Mississippi Supreme Court reversed a chancellor's grant of a divorce' to Ames Kergosien from Rosalie Kergosien on the ground of cruel and inhuman treatment. We note that Rosalie's conduct as it related to her mismanagement of family funds is similar to Gay's conduct. The court noted:
The record reflects that Rosalie Kergosien's manner of handling money caused Mr. Kergosien hardship and embarrassment. She would not balance the checkbook or keep the statements, and she constantly caused the account to be overdrawn. Her failure to pay utility bills and to pay attention to disconnect notices caused Mr. Kergosien to get all the bills sent to him at his office.
Id. at 1208. Nevertheless, the court held that Ames was not entitled to a cruel and inhuman treatment divorce because, although Rosalie's conduct was atrocious, it did not have an adverse impact on Ames's health. Id. at 1210. The court concluded that "[n]owhere in the testimony is there anything indicating that the appellee's health was even slightly impaired, as in Wires [v. Wires, 297 So.2d 900 (Miss. 1974)]." Id. In Kergosien, the court noted that in Wires it upheld a chancellor's grant of divorce on the ground of cruel and inhuman treatment "where the proof showed that the wife was jealous and accused the husband of philandering with his secretary; that her bickering caused their son to leave home; and that she made anonymous calls to his secretary," which the husband complained caused him to "have a knot in his stomach." Id. The Wires court held that in order to uphold a cruel and inhuman treatment divorce:
"The conduct of the offending spouse must be so unkind as to be cruel, that is, so unreasonably harsh and severe as to be inhumane, so lacking in human qualities, so unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb, or health. And finally, such conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself." Bunkley and Morse, Amis on Divorce and Separation in Mississippi § 3.14(3), at 114 (1957); cited in Burnett v. Burnett, 271 So.2d 90, 92 (Miss.1972).
Wires, 297 So.2d at 902.
¶ 27. Unlike in Kergosien, there is considerable evidence that the marriage had a negative impact on Peirce's health. Gwen Milton, Peirce's former office manager; Adrian Haynes, Peirce's sister; and Peirce all testified about how the marriage had negatively impacted Peirce's health. Milton testified as follows:
Q. The last two years since January, 2005, have you seen any changes in Mr. McIntosh's personality 
A. Yes.
Q. Describe, if you will, what that is.
A. His health is not what it used to be. He seems more depressed, more of something else on his mind. He's just not as strong as he used to be.
Q. This is the school year '06/'07, and I know that's the way you measure things given the fact you've been 18 years at [the high school]. When did you first notice that?
A. Say, at the beginning of the school '05/'06.
Q. And when would that start?
A. In August of '05.
Q. Tell me what you saw, as specific as you can be.

*1265 A. His health seems to be deteriorating some. He's having a lot of problems with his blood pressure and his diabetes.
Q. There are things that he told you about?
A. These are things that I've seen.
¶ 28. Additionally, Haynes provided the following testimony:
Q. During the last ten years, bringing yourself forward to this time, what changes, if any, have you seen in your brother?
A. Well . . . you say ten years?
Q. Yes, mam [sic].
A. Actually, there's been a lot of changes I'm going to say probably in the last two years that I've seen.
Q. All right. Give yourself the best time period that you can to give the court your testimony.
A. Okay. Now, I don't know exactly when he  he has diabetes, so I don't know exactly when he got that. I cannot tell you exactly. But I know it's a lot worse now than what it was and I do know, if you know him and look at him, you can tell that he's sick. Even his color has entirely changed. I talk to him almost daily now, you know, and that's been the last, a little over a year, and it's because of his depression and everything.
* * * *
A. Okay. As I said, I notice a depression in him. He didn't tell me this, but I noticed this and then, when he gets depressed, and I know that's the reason he calls me. He may call me at 1:00 in the morning and just to talk or just to tell me something, you know, that has happened. I may say, hey, don't call me at 1:00 in the morning. But I tease him about that. Like I say, his color. His color used to be a lot lighter and, if he sat there very long, he's going to fall asleep. I can't tell you if it's because of the diabetes, but that's just what I believe is in his depression stage.
Q. Now, take the court back to the first time you noticed this depressive stage that you talk about and how did it manifest itself; that is, how did it exhibit itself to you?
A. Oh, wow, let's see.
Q. I know that's two questions and I can break them down if you wish.
A. Okay.
Q. First off, when did you first notice?
A. I'm going to say probably a year ago or maybe a little bit over a year, but I'm going to say about the first of '05, maybe. Around the first part of '05 
Q. All right.
A.  is when it really started getting real prevalent is around that time.
Q. And how did it manifest itself? How did it exhibit itself to you?
A. I guess that just by what I just said. It started manifesting after, I guess, the first of the year and it's through the frequent phone calls and I guess  am I answering what you need? The frequent phone calls, the depressive stage, and divorce. He was talking about that to me. He began to talk about that to me. Actually, I noticed it before that, before I knew about it. But I never got into his personal business.
¶ 29. Finally, Peirce testified that he had been experiencing health problems as a result of his relationship with Gay:
Q. What is the condition of your health, Mr. McIntosh?

*1266 A. Without being facetious, you know, my health is not very good, but I thought I was okay. But people been talking about me pretty bad lately, so I'm feeling a little sick. I'm a diabetic. I have pneumonia right now. It's a small case. Of course, my blood pressure is high and my diabetes runs real high. So, that's where I'm at.
* * * *
Q. How has [sic] the issues of your separation impacted upon, based on what you know, your diabetes?
A. You know, Your Honor, I'd like to think it hasn't impacted at all, but like I said, they've been telling me it's been impacting me. But I like to think that it hasn't impacted it at all. The stress supposed [sic] to have such a . . . I have a little knowledge, but I'd like to have more knowledge of pretty much what's all going on. My sister was right, my color have [sic] changed. I know I'm getting real dark in this area here. I know my eyes are real hazy a lot. So, I don't know. I just know that I want this over so that I can get on. I know that much. I've made a move. I'm going in another direction. I just want to get my son out of high school and in college and move on.
¶ 30. Based on the testimony quoted above, we find that the proof in our case is sufficient to support a divorce on the ground of habitual cruel and inhuman treatment. It is clear that Peirce's mental and physical health has deteriorated as a result of Gay's antics, unlike in Kergosien where the court found no such evidence.
¶ 31. Third, Gay cites Gallaspy v. Gallaspy, 459 So.2d 283 (Miss.1984). In Gallaspy, the chancellor granted Audra Fox Gallaspy. a divorce on the ground of habitual cruel and inhuman treatment. Id. at 284. The Mississippi Supreme Court reversed, finding that the facts did not rise to the level of cruel and inhuman treatment. Id. at 285. Audra offered the following reasons as the basis for her contention that she should be granted a habitual cruel and inhuman treatment divorce:
appellant's criticism of her being overweight; that his first priority was his work, where he spent long hours when he could have been at home; that his second priority was his mother and his father's estate; that he was critical of appellee's family; and that he did not praise or support the children enough and his discipline was too severe for them.
Id.
¶ 32. In reversing the chancellor, the Gallaspy court stated, "We recognize that courts have become liberal in the application of proof on the habitual cruel and inhuman treatment ground. However, by no means have they made a farce and mockery of the requirement to prove the ground." Id.
¶ 33. We fail to see how Gallaspy lends Gay any support, as we see no comparison between the acts alleged to constitute cruel and inhuman treatment in Gallaspy and the acts that Gay admitted to committing. As previously stated, Gay admitted that she had stolen checks from Peirce's checkbook, cashed in Peirce's savings bonds, failed to use money to pay the rent, and returned items to stores for cash after using a credit card to make the purchases. Based on these facts, we cannot say that the chancellor was manifestly wrong as to law or fact.
¶ 34. Fourth, Gay cites this Court's opinion in Crenshaw v. Crenshaw, 767 So.2d 272, 274(¶ 1) (Miss.Ct.App.2000), wherein we affirmed a chancellor's finding *1267 that the evidence did not rise to the level of habitual cruel and inhuman treatment. In Crenshaw, Thomas Crenshaw sought a habitual cruel and inhuman treatment divorce from his wife, Cynthia Crenshaw, based on his assertion that "when he was commuting to a job in Memphis and going to school, he would sometimes come home to find no food prepared and his clothes not laundered and ironed for the following day." Id. at 274(¶ 4). Thomas also asserted that "his wife sometimes would be unavailable for marital relations for as much as a month at a time." Id. at 274(¶ 5).
¶ 35. We note at the outset that much of the evidence in Crenshaw was disputed, and the chancellor found in favor of Cynthia, ruling that her actions did not constitute habitual cruel and inhuman treatment. However, in our case, the facts related to Gay's habitual cruel and inhuman treatment of Peirce were not in dispute. The chancellor found that Gay's conduct was sufficient to warrant Peirce a divorce on the ground of habitual cruel and inhuman treatment. If we were deciding the case, we may have decided it differently; however, we must give deference to the chancellor's finding, as she heard the evidence and determined that Gay's actions rose to the level of cruel and inhuman treatment. See Owen v. Owen, 928 So.2d 156, 168(¶ 35) (Miss.2006).
¶ 36. In Crenshaw, we noted that the "conduct must either (1) endanger life, limb, or health, or create a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) be so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying any basis for its continuance." Crenshaw, 767 So.2d at 275(¶ 11) (emphasis added) (citing Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993)).
¶ 37. Although the chancellor did not specify which type of conduct supported her finding, obviously Gay's conduct would fall within the second category relating to conduct that is "so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying any basis for its continuance." Crenshaw, 767 So.2d at 275(¶ 11). Although not mentioned in the chancellor's judgment, we find it particularly disturbing that Gay was involved in a shoving match with Peirce shortly after he had been so ill that she "thought he was having a heart attack."
¶ 38. Moreover, we point out the impropriety of Gay's act of forging Peirce's name to the savings bonds, cashing them without notifying him before doing so, and pretending to help him look for them afterward. Such acts certainly qualify as conduct that could have rendered the marriage revolting to Peirce and could have made it impossible for him to discharge the duties of marriage.
2. Separate Maintenance
¶ 39. "Separate maintenance is a court-created equitable relief based upon the marriage relationship and is a judicial command to the husband to resume cohabitation with his wife, or in default thereof, to provide suitable maintenance of her until such time as they may be reconciled to each other." Perkins v. Perkins, 787 So.2d 1256, 1262(¶ 15) (Miss.2001) (citing Daigle, 626 So.2d at 144). "[T]he allowance of separate, maintenance and the amount to be awarded are for the most part matters within the discretion of the chancellor." Honts v. Honts, 690 So.2d 1151, 1153 (Miss.1997). We will not reverse unless the decision was against the *1268 overwhelming weight of the evidence. Id. (citing Tanner v. Tanner, 481 So.2d 1063, 1064 (Miss.1985)),
¶ 40. The Mississippi Supreme Court has held that "[t]he power to grant separate maintenance to a wife was based on (a) separation without fault on the wife's part, and (b) willful abandonment of her by the husband with refusal to support her. These jurisdictional requirements for a separate maintenance decree have continued up to the present time." Robinson v. Robinson, 554 So.2d 300, 303 (Miss. 1989) (emphasis added) (quoting Thompson v. Thompson, 527 So.2d 617, 621 (Miss. 1988)). "[A] wife is not required to be totally blameless to allow an award of separate maintenance, `but her (mis)conduct must not have materially contributed to the separation.'" Daigle, 626 So.2d at 145 (quoting Lynch v. Lynch, 616 So.2d 294, 296 (Miss.1993)).
¶ 41. Although Gay contends that she is entitled to separate maintenance, we agree with the chancellor that she failed to satisfy both prongs of the test, as she failed to prove that Peirce refused to support her. Gay testified that during their separation Peirce continued to pay the majority of the household bills. Likewise, Peirce testified that he was "willing to pay anything." It is well established that the chancellor is afforded great deference with regard to matters which are the subject of appeal. Tanner, 481 So.2d at 1064. We find no merit to this assignment of error.
3. Division of Marital Estate
¶ 42. In this assignment of error, Gay asserts that the chancellor erred in failing to consider Peirce's PERS account, deferred compensation plan, and non-retirement accounts when dividing the marital estate. In Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994), the Mississippi Supreme Court announced factors that chancellors should consider when equitably dividing a marital estate. The court held:
Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments *1269 and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
Id.
¶ 43. In Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994), the Mississippi Supreme Court outlined the procedure for applying the Ferguson factors. The Johnson court held that "division of marital assets is now governed under the law as stated in Hemsley [v. Hemsley, 639 So.2d 909, 914-15 (Miss.1994)] and Ferguson." Id.
[T]he character of the parties' assets, i.e., marital or nonmarital, must be determined pursuant to Hemsley. The marital property is then equitably divided, employing the Ferguson factors as guidelines, in light of each parties' nonmarital property. Ferguson, 639 So.2d at 928. If there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered.
Id.
¶ 44. In the present case, the chancellor made specific findings in the record to show that she considered Ferguson and Hemsley before dividing the marital estate. Although the chancellor failed to provide a figure for the total value of the marital estate, we necessarily conclude from the figures given in her judgment that the marital estate totaled $275,027.95, of which Gay received $137,269.64 and Peirce received $137,758.31. The chancellor concluded that parties' taxes and liabilities totaled $169,961.59, of which $84,562.50 was assigned to Peirce and $85,399.09 to Gay.
¶ 45. Gay strenuously argues that the chancellor "left out and thus failed to consider" Peirce's PERS account. Gay acknowledges that Peirce listed the PERS account on his Rule 8.05 form which was received into evidence.[11] Nevertheless, she contends that Peirce failed to list the PERS account as an asset on the 8.05 form. We note that Gay's counsel did not bring this oversight to the chancellor's attention either before the judgment was entered, or in any posttrial motion, even though counsel was aware of its existence. Moreover, Peirce was questioned extensively on cross-examination about deductions listed on his 8.05 form during the August 2006 hearing. Gay's attorney brought to the chancellor's attention that Peirce had taken a job as the principal of another high school and earned a higher salary:
Q. And to get this 8.05 accurate, we would apply those new deductions to your new income.
A. What I did was  what I tried to do  was this right here. I can tell you what I tried to do. Before I got this, number 11, when I got that, I was trying to figure, tried to work it out myself about What was what there, federal arid state tax. I just received this this weekend.
Q. I understand. I'm not questioning  all we're doing is trying to reflect *1270 the 8.05 to reflect what it is today. And so, where it says state income tax, instead of one forty-four, it would be two sixty-fix. [sic] Is that right?
A. Right.
Q. And federal income tax, instead of three sixty, it would be eight thirty-five oh [sic] three?
A. Right.
* * * *
Q. And the mandatory retirement, instead of $477.82, is $536.99. Is that right?
A. That's correct.
Q. And then this retirement, you have $1100.00 in exhibit number 9, that is not mandatory? That is voluntary on your part, as I understand it.
A. Yes, that's voluntary on my part.
¶ 46. As illustrated in the above colloquy, in addition to questioning Peirce about his PERS account, Gay's counsel questioned Peirce about monthly payments he had made to a voluntary retirement account. It was the responsibility of Gay's attorney to inform the chancellor that the chancellor had failed to consider certain accounts at the time she divided the marital estate. This should have been done by filing a motion to amend the final judgment of divorce, prior to bringing this issue on appeal. The attorney failed to do so. Therefore, we find that this issue is procedurally barred because it was not first raised at the trial level. Brown v. Thompson, 927 So.2d 733, 738(¶ 16) (Miss. 2006) (citing Scott v. State, 878 So.2d 933, 963(¶ 81) (Miss.2004)). This issue is without merit.
4. Alimony
¶ 47. Gay contends that the chancellor erred in declining to award her periodic, lump sum, or rehabilitative alimony. Apparently, Gay contends that she is entitled to alimony because the chancellor divided the marital estate without being fully abreast of all of the relevant information, as the chancellor failed to consider Peirce's PERS account, deferred compensation plan, and retirement and non-retirement accounts. "Alimony awards are within the discretion of the chancellor; this Court will not reverse an award on appeal absent manifest error or abuse of discretion." Watson v. Watson, 724 So.2d 350, 354(¶ 18) (Miss.1998) (citing McEachern v. McEachern, 605 So.2d 809, 815 (Miss.1992)). When making a determination on whether to award alimony, chancellors are required to consider the following factors announced in Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993) (citing Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss.1992)):
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection *1271 with the setting of spousal support.
¶ 48. Additionally, a year after deciding Armstrong, the Mississippi Supreme Court enumerated factors in Hemsley which should be considered when chancellors are attempting to reach a reasonable alimony award:
(1) the health of the husband and his earning capacity;
(2) the health of the wife and her earning capacity;
(3) the entire sources of income of both parties;
(4) the reasonable needs of the wife;
(5) the reasonable needs of the child;
(6) the necessary living expenses of the husband;
(7) the estimated amount of income taxes the respective parties must pay on their incomes;
(8) the fact that the wife has the free use of the home, furnishings and automobile, and
(9) such other facts and circumstances bearing on the subject that might be shown by the evidence.
Hemsley, 639 So.2d at 912-13 (citing Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 153 (1955)).
¶ 49. We find that the chancellor's refusal to award alimony was not against the weight of the evidence. However, in the interest of being thorough, we will briefly summarize the law as it relates to periodic, lump sum, and rehabilitative alimony.
a. Periodic Alimony
¶ 50. "The award of periodic alimony arises from the duty of the husband to support his wife." Watson, 724 So.2d at 354(¶ 17) (citing McDonald v. Mc-Donald, 683 So.2d 929, 931 (Miss.1996)). "The husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay." Id. (quoting Brennan v. Brennan, 638 So.2d 1320, 1324 (Miss.1994)). "In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion." Id. at 354-55 (quoting Armstrong, 618 So.2d at 1280). "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." Lauro v. Lauro, 847 So.2d 843, 848(¶ 13) (Miss. 2003). In light of the fact that the chancellor essentially split the marital estate equally, we cannot find that the chancellor abused her discretion in denying an award of alimony to Gay.
b. Lump Sum Alimony
¶ 51. When reviewing a chancellor's decision to deny lump sum alimony we employ the factors considered by the Mississippi Supreme Court in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss.1988):
1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business.
2) A long marriage.
3) Where recipient spouse has no separate income or the separate estate is meager by comparison.
4) Without the lump sum award the receiving spouse would lack any financial security.
(internal citations omitted). Additionally, the Cheatham court concluded that the single most important factor is the disparity of the separate estates. Id, We note that the disparity between Gay and Peirce's estate is less than five hundred dollars. Furthermore, we acknowledge that Peirce earns significantly more than *1272 Gay; however, we note that the chancellor took this into consideration and found that: "Both Peirce and Gay's marital assets, after equitable division and in light of their income, will adequately provide for both parties. In addition, although Peirce earns three times more money than Gay, the equitable division of the marital property resulted in no appreciable deficit for either party." This issue lacks merit.
c. Rehabilitative Alimony
¶ 52. In Lauro, 847 So.2d at 849(¶ 15), the Mississippi Supreme Court concluded that: "Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient. Therefore, rehabilitative alimony is not considered during equitable distribution."
¶ 53. Clearly, Gay's contention that she is entitled to rehabilitative alimony is flawed, as the record is devoid of any evidence indicating that she "put her career on hold" to take care of the marital home. At the time of both of the hearings, Gay was employed full-time as a school teacher, and there is nothing in the record to suggest that Gay sacrificed her career for the marriage. Thus, we give deference to the chancellor's decision to deny Gay rehabilitative alimony. There is no merit to this issue.
5. Attorney's Fees
¶ 54. Gay requested attorney's fees in the amount of $12,022.50 for 68.70 hours of work and expenses in the amount of $829.52. The chancellor concluded that Gay's attorney's fees were excessive and unreasonable. Accordingly, the chancellor reduced them by half and awarded Gay $3,005.63 in attorney's fees and $414.76 for the expenses. "The question of attorney fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court." Overstreet v. Overstreet, 692 So.2d 88, 93 (Miss.1997) (citing Kergosien, 471 So.2d at 1212). A chancellor should only grant attorney's fees in situations where the requesting party can establish an inability to pay. Id. (citing Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss.1992)). Although the chancellor noted that Gay testified that she was unable to pay her attorney's fees, the chancellor found that Gay will "have a "small amount of extra money" after she pays her reasonable attorney's fees. We find no merit to this issue.
6. Motion for Stay and Reinstatement of Temporary Order
¶ 55. Peirce argues that the chancery court erred in granting a stay of the final judgment of divorce and that the chancery court lacked authority to reinstate its temporary order. We agree. Rule 59(e) of the Mississippi Rules of Civil Procedure provides: "A motion to alter or amend the judgment shall be filed not later than ten days after entry of the judgment." Thus, the chancery court lost jurisdiction, ten days after the court entered its final judgment of divorce, as Gay failed to file a posttrial motion. Moreover, a temporary order terminates when a final judgment is entered. We find that the chancery court erred in granting the stay and in reinstating its temporary order of support. Therefore, we reverse and render the chancery court's judgment granting the stay. We also reverse the chancery court's reinstatement of the temporary order and remand to the chancery court, with directions to make an accounting of what Peirce would have been required to pay under the final judgment had it not been stayed and what he has paid pursuant to the temporary order. *1273 We also order the chancellor to make an adjustment for any excess money that Peirce has paid pursuant to the temporary order that he was not ordered to pay in the final judgment of divorce.
7. Supersedeas Bond
¶ 56. Peirce also argues that the chancellor erred in granting the stay without requiring Gay to post a supersedeas bond. As support, Peirce directs our attention to Rule 8(b)(1) of the Mississippi Rules of Appellate Procedure and Mississippi Code Annotated section 11-51-31 (Rev.2002).[12] We agree with Peirce that the chancellor erred in granting the stay without requiring Gay to post a supersedeas bond, and we reverse and render the chancellor's decision on this point. However, we decline to order that a bond be entered, as the need for it is now moot. Therefore, the stay is hereby dissolved. Nonetheless, we note that if Gay desires to maintain a stay of this cause pending further judicial proceedings, she is required to post a supersedeas bond pursuant to Rule 8(b)(1) or any other applicable law.
¶ 57. THE JUDGMENT OF THE WASHINGTON COUNTY CHANCERY COURT IN CAUSE NO. 2006-CA-02136 IS REVERSED AND RENDERED AND REMANDED. THE JUDGMENT OF THE WASHINGTON COUNTY CHANCERY COURT IN CAUSE NO. 2006-CA-01762 IS AFFIRMED. ALL COSTS OF THESE APPEALS ARE ASSESSED TO THE APPELLANT IN CAUSE NO. 2006-CA-01762.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] According to Gay, during the separation, Peirce paid ninety-five percent of the household bills, including the mortgage.
[2] Peirce testified that in the early nineties he and Gay began having problems with the IRS again for failure to pay income taxes. He admitted that he had not paid taxes, because he assumed that he was not required to do so because he was losing money and not making a profit. Based on his testimony, at the time of the hearing Peirce was working to become current with the IRS.
[3] Upon examination by the court, Peirce elaborated by stating that early in their marriage, Gay told him that she had given birth to a child who had died. However, about ten years into their marriage, he found out that the child was in fact alive and had been put up for adoption.
[4] Peirce admitted that he had an affair shortly after he and Gay were married; however, he testified that he had not been unfaithful in the last ten years.
[5] Deputy Grantham contradicted Peirce on this point. According to Deputy Grantham, Peirce left while he was speaking with Gay.
[6] Gay testified that she recognized Gloria's voice because Gloria and Peirce had worked together for many years, and Gloria would answer the telephone when Gay called Peirce at work.
[7] Although the record is not clear as to what caused Peirce's illness on the night he left the marital home, we note that he was diagnosed with Type II Diabetes in 1999 and is dependent on insulin.
[8] During the examination by the court, the chancellor asked Gay whether Peirce gave a reason as to why he was leaving her. Gay responded that Peirce simply stated that he was "tired of this mess."
[9] According to Gay, she and Peirce had sexual relations on least three occasions after Peirce left the marital home.
[10] Gay also admitted that she did not tell Peirce that she had taken the savings bonds; instead, she helped him look for the bonds before finally telling him that she had cashed them in.
[11] Peirce's initial 8.05 form was admitted into evidence at the December 2005 hearing; however, an updated 8.05 form was admitted at the August 2006 hearing.
[12] Rule 8(b)(1) provides:

Application for a stay of the judgment or the order of a trial court pending appeal or for approval or disapproval of a contested supersedeas bond or for an order suspending, modifying, restoring, or granting an injunction during the pendency of an appeal must ordinarily be made in the first instance to the trial court. The court shall require the giving of security by the appellant in such form and in such sum as the court deems proper, and for good cause shown may set a supersedeas bond in an amount less than the 125 percent required in cases under 8(a).
Mississippi Code Annotated section 11-51-31 provides: "A supersedeas shall not be granted in any case pending before the Supreme Court, unless the party applying for it shall give bond as required by the Rules of the Supreme Court."