# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CA-00713-SCT

*FINIS R. MCFARLAND, JR.*

*v.*

*D'ANNE P. MCFARLAND*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/15/2011 |
| TRIAL JUDGE: | HON. EUGENE LOVE FAIR, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MAURA DELANEY MCLAUGHLIN |
| ATTORNEY FOR APPELLEE: | RENEE M. PORTER |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 01/24/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., CHANDLER AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     In this divorce case, the husband appeals the trial court's award of lump-sum alimony, temporary alimony, and interest to the wife. The chancellor examined all relevant factors in determining lump-sum alimony, and his determination is supported by the record. Furthermore, the chancellor was within his power to enforce the temporary order and continue the obligation of temporary alimony until the divorce was finalized. Last, the chancellor did not err in awarding interest on monies owed to the wife that were more than a year past due. Because the chancellor did not err in any of these determinations, this Court affirms the trial court in all respects.

## FACTS AND PROCEDURAL HISTORY

¶2.     Finis "Skip" McFarland and D'Anne McFarland married on June 17, 1978, when D'Anne was twenty years old and Skip was four days shy of his thirty-fifth birthday. D'Anne had a tenth-grade education and a GED, while Skip attended some college. It was Skip's second marriage, and he had three children from his first marriage, with whom he had visitation. Skip and D'Anne then had two children of their own, both of whom are now emancipated by age. D'Anne held a few short-term jobs during the marriage, but was primarily a stay-at-home wife and mother, while Skip worked full-time throughout most of the marriage. In 1999, Skip and D'Anne opened a business together, Precision Vision. D'Anne paid herself about $500 per month for operating Precision Vision, until the months leading up to the divorce, when she paid herself $500 per week. Skip and D'Anne began sleeping in separate bedrooms in the fall of 2006, with plans of divorcing, and Skip moved out of the house in January of 2007.

¶3.     D'Anne filed for divorce on January 31, 2007, on the grounds of habitual cruel and inhuman treatment. On March 13, 2007, the trial court entered an agreed temporary order, which governed the status of the parties for several years. The temporary order included a provision giving D'Anne use of the house and provided that Skip would pay the mortgage. It also provided that D'Anne "shall turn over day-to-day control of the business known as 'Precision Vision, Inc.' to" Skip, that Skip must account to D'Anne monthly for all business transactions, and further that Skip "shall pay to [D'Anne] the sum of $500.00 per month . . . from operations of Precision Vision, Inc. by [Skip], until further Order of this Court." After the separation, D'Anne worked odd jobs, including construction, picking up cans, and

2

cleaning, but as of December 2010, she had not filled out any formal job applications. D'Anne has not reported all her income from these odd jobs to the Internal Revenue Service (IRS).

¶4.    On September 10, 2009, Skip and D'Anne presented the trial court with an agreement to divorce on the grounds of irreconcilable differences, presenting the sole issue of alimony to the court.  The court then held a hearing during which the agreement between the parties was announced into the record orally. The parties do not have a formal written agreement. Under the oral agreement, the parties agreed to the following provisions relevant to this appeal: 1) D'Anne would vacate the home by October 1, 2009; 2) Skip would pay D'Anne fifty percent of the appraised value of the home within sixty days of the hearing (rendering the deadline on or about November 10, 2009); 3) the parties would equally divide their certificates of deposit in the amount of $20,327.34; 4) the parties would equally divide a Fidelity Individual Retirement Account (IRA) in the amount of approximately $63,000; and 5) Skip would pay D'Anne fifty percent of the appraised value of Precision Vision after the appraisal.  The home ultimately was appraised at $190,000 and Precision Vision was appraised at $33,000.  This agreement was not reduced to or included in an order, until the final order was entered approximately one and a half years later.

¶5.    On October 12, 2009, D'Anne filed a complaint to cite Skip in contempt of court for his failure to account to D'Anne for the business and for his failure to pay D'Anne $500 per month from the business.  The chancellor heard arguments on the matter on December 17, 2009.  Skip argued that the agreement between the parties in September 2009 had resolved the issue. The chancellor agreed with D'Anne that the $500-per-month obligation should

continue, stating that as of the December 2009 hearing, the marriage was still in existence, thus "the obligations for support and for sharing of expenses and assets remains, and I think the 500 bucks at least will get us past the point and to a point where a final decision can be made." The chancellor indicated that the $500 per month was equitable because Skip had not paid D'Anne for her interest in the house, nor had Precision Vision even been appraised, yet D'Anne had vacated the house in a timely manner, stating "I think the monthly obligations that we agreed were reasonable way back probably ought to continue if, in fact, the 60 days is not going to take place as agreed on and the appraisal is not going to take place as agreed on."

¶6.     In December 2010, nearly four years after the divorce action was initiated, and more than one year after the parties' agreement on most issues, the court held a trial on the alimony issue. At the trial, Skip had yet to pay D'Anne for her fifty percent interests in the home[1] and business, and he had not yet paid her an agreed-upon sum of $1,500 in exchange for personal property he received. D'Anne had not yet paid Skip his half of the CDs. The Fidelity IRA likewise had not been divided.[2]

---

[1]D'Anne vacated the home by October 1, 2009, in accordance with the parties' agreement.

[2]Initially, it was thought that the Fidelity IRA was in D'Anne's possession Later, it was determined that it was in Skip's possession. It was to be divided by a Qualified Domestic Relations Order (QDRO) to avoid tax consequences, which was not entered by the court until after the final judgment.

4

¶7. In its April 18, 2011, Amended Opinion and Final Judgment,[3] the court summarized the parties' agreement, finding that Skip owed D'Anne $111,500 (D'Anne's half of the house and business) that was past due, and D'Anne owed Skip $12,613.67 (Skip's half of the certificates of deposit and a Precision Vision account) that was past due, thus both parties were in breach of the contractual agreement of September 2009. The court determined that the net past-due obligation amounted to Skip owing D'Anne $98,886.33. In addition, D'Anne, by agreement, was to receive $31,500 from the Fidelity IRA once a QDRO was entered. The court ordered Skip to pay D'Anne $98,886.33 within thirty days of the filing of the judgment. The court further awarded D'Anne interest on the "net unaccomplished obligations" at the rate of eight percent, finding that "[i]nterest may be calculated on amounts due . . . for payment of half of the accounts, half of the house value, and half of the business value from the dates set out as effective dates for payment."

¶8. The chancellor then addressed alimony, making detailed findings on each of the factors required by *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993). Next, the chancellor examined the *Cheatham* factors to determine whether an award of lump-sum alimony was appropriate. *See Cheatham v. Cheatham*, 537 So. 2d 435 (Miss. 1988). The chancellor concluded that a deficit existed in the equality of the asset division and that D'Anne needed security in her later years as a result of her many years of "unpaid contribution to the family business and her contribution to the marriage in caring for their children as well as those of Skip." He thus awarded D'Anne lump -um alimony in the form

---

[3]The court's initial judgment was incorrect in some of its calculations of debts and obligations of the parties, thus this judgment was entered clarifying and correcting them.

of the transfer of the entirety of the Fidelity IRA to D'Anne. This consisted of $31,500 due D'Anne contractually, and $31,500 that was to go to Skip contractually, but would be considered lump-sum alimony and be awarded to D'Anne.

¶9. Skip filed a motion for new trial or in the alternative for amended findings of fact and conclusions of law and judgment on April 28, 2011, which the trial court denied. Aggrieved, Skip appeals to this Court.

## ANALYSIS

*1. Lump-Sum Alimony*

¶10. "When this Court reviews a chancellor's decision in a case involving divorce and all related issues, our scope of review is limited by the substantial evidence/manifest error rule." *Yelverton v. Yelverton*, 961 So. 2d 19, 24 (Miss. 2007). Thus, this Court will not disturb the chancellor's findings "unless the chancellor was manifestly wrong, clearly erroneous or a clearly erroneous standard was applied." *Id.* (internal quotations omitted).

¶11. Skip argues that the chancellor erred in awarding D'Anne lump-sum alimony. He contends that the chancellor made erroneous findings about D'Anne's and Skip's estates and incomes, and failed to take into consideration that Skip was near retirement age. He argues that the chancellor "in effect changed Skip's position from difficult to destitute." He further maintains that the chancellor failed to consider that D'Anne lied regarding her assets, her income, and her earning ability.

¶12. Skip's arguments are without merit. First, as to Skip's arguments regarding D'Anne's truthfulness regarding income and work skills, the court specifically found that D'Anne (and Skip, for that matter) had been less than truthful in dealings with the IRS. Furthermore, the

6

court found that D'Anne had the ability to earn at minimum-wage level and that she "has the ability to manage the day to day details of a small and previously successful business." Thus, the court did find that D'Anne had not always been honest, and it also found that D'Anne did indeed have the ability and skills to work. Skip's assertion that the court failed to consider that D'Anne "lied" is without any merit. Moreover, "[i]n a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province." *Carambat v. Carambat*, 72 So. 3d 505, 510 (Miss. 2011). The chancellor's findings regarding D'Anne are supported by substantial evidence, thus he did not manifestly err in that regard.

¶13. Skip also argues that the court rendered him destitute. The record contains detailed financial information for both parties that was before the court. Skip received the marital home, the joint business, two automobiles, ample personal property, half of the certificates of deposit, plus an inheritance from his parents, and was to receive additional inheritance. In addition, Skip collects a monthly social security benefit in the amount of $1,457.00.[4] Although the chancellor found that Skip was not financially secure, he certainly is not destitute, thus the chancellor's findings regarding Skip were supported by substantial evidence.

---

[4]D'Anne is to receive one-half the appraised value of the home and business, received an inheritance from her mother, and owns a trailer home. She is not yet eligible to receive social security benefits, and will not be for several years. When she is eligible receive social security benefits, the monthly amount will be approximately half of what Skip receives monthly.

¶14. The court made detailed findings under the *Armstrong* and *Cheatham* factors. Among its findings were that Skip and D'Anne had a long marriage, that D'Anne assisted Skip in his business ventures and spent time as a housewife raising their two children and Skip's three children from a previous marriage while Skip traveled for business, and that "[w]hile neither party would be characterized as financially secure, D'Anne is less secure than Skip." It noted that the most income D'Anne earned in any year was $8,000, while Skip's high year was $89,578. Its findings are amply supported by the record before this Court. It concluded that an award of lump-sum alimony in the amount of approximately $31,500 was appropriate "to deal with the net value of taxes, interest and opportunity costs on the various sums owed by each to the other, the 'deficit' in attainment of equality of division . . . and the need of D'Anne for security in her later years resulting from the years of unpaid contribution to the family business and her contribution to the marriage in caring for their children as well as those of Skip."

¶15. This Court has held that a trial court must apply the *Ferguson* factors in determining an award of lump-sum alimony "in all appropriate situations." *Yelverton*, 961 So. 2d at 25-26. The *Ferguson* factors are:

1. Substantial contribution to the accumulation of the property (*see Cheatham* factor No. 1).
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise. [*see Armstrong* factor No. 11]
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution such as [non-marital assets].

8

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution. [*see Armstrong* factor No. 9]

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties.

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity (*See Cheatham* factors Nos. 3 & 4).

8. Any other factor which in equity should be considered (*See Cheatham* factor No. 2).

*Yelverton*, 961 So. 2d at 25-26 (second alteration in original).

¶16. While the chancellor did not specifically set forth and apply the *Ferguson* factors as he should have, the omission is not reversible error in this case. This Court has found that *Cheatham* does not necessarily apply to a small award of lump sum alimony – $15,000 in *Bland*. *Bland v. Bland*, 629 So. 2d 582, 587 (Miss. 1993). In *Bland*, the Court found that the chancellor relied on the *Cheatham* factors at least in part, and that "the amount of alimony 'should be reasonable . . . commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay.'" *Id.* at 587-88 (quoting *Gray v. Gray*, 562 So. 2d 79, 83 (Miss. 1990)) (alterations in original). Thus, the trial court's failure to specifically cite *Cheatham* was not reversible error. *Id.* Similarly, in this case, the lump-sum alimony award was a smaller one, approximately $31,500, and the chancellor considered D'Anne's accustomed standard of living, her own resources, and Skip's ability to pay. In this case, the chancellor went so far as to specifically apply the *Cheatham* factors, and he also relied on the *Ferguson* factors.

¶17. Furthermore, the chancellor appears to have considered all the *Ferguson* factors that are relevant to this case, despite failing to cite the case itself. *Yelverton* states that *Ferguson*

should be applied in all "appropriate" situations. ***Yelverton***, 961 So. 2d at 25. In this case, all personal and real property was painstakingly divvied up by prior agreement by the parties, rendering some of the ***Ferguson*** factors less applicable to the chancellor's consideration. The chancellor considered ***Ferguson*** factors 1, 2, 5, 7, and 8 in his analysis of the ***Armstrong*** and ***Cheatham*** factors. While the chancellor did not specifically cover factors 3, 4, and 6, he did note the value of each party's nonmarital assets, including their respective inheritances and D'Anne's trailer. Moreover, the parties came to an agreement regarding their property, which renders the factors regarding division of property, particularly the emotional value of the assets, less applicable.

¶18. Therefore, the chancellor did not manifestly err in awarding D'Anne lump-sum alimony. The legal standard he applied, while not ideal because of the failure to specifically cite and apply ***Ferguson***, was not clearly erroneous, as the chancellor did consider all the ***Ferguson*** factors relevant to the determination of lump-sum alimony.[5] Further, substantial evidence supports the award.

*2.     Interest*

¶19. The decision to award prejudgment interest is reviewed for abuse of discretion. ***Arcadia Farms P'ship v. Audubon Ins. Co.***, 77 So. 3d 100, 105 (Miss. 2012). The trial court ordered Skip to pay interest on the money he failed to pay D'Anne under the parties' agreement. Skip does not argue that ordering interest in the first instance was error, but

_____

[5]We emphasize that this holding does not dispense with a chancellor's obligation to analyze the ***Ferguson*** factors in making a determination of lump-sum alimony. Chancellors should continue to analyze each ***Ferguson*** factor with specificity when determining whether to award lump-sum alimony.

10

rather argues that it was error for the trial court not to likewise order D'Anne to pay interest on the money she owed Skip under their agreement, stating that the chancellor "should have awarded both parties interest or neither party." This point of error is entirely without merit.

¶20. The court found that D'Anne owed Skip $12,613.67 and that Skip owed D'Anne $111,500, and that these amounts were more than a year past due. Thus, the net unaccomplished contract obligations amounted to Skip owing D'Anne $98,886.33, which is the amount on which the court ordered interest. If the court had ordered interest on the amount that D'Anne owed Skip, it follows that it would have ordered interest on the total amount of $111,500 that Skip owed D'Anne, and the amounts of interest would have offset, or even placed Skip in a worse position than he is now. The trial court is affirmed on this issue, as it clearly did not abuse its discretion in ordering interest on the past-due net unaccomplished obligation between the parties, rather than on the entire amounts owed.

*3. $500 per Month Under Temporary Order*

¶21. While a chancellor's decisions in a divorce action are reviewed for manifest error, a property settlement agreement is a contract, and contract interpretation is a question of law, which is reviewed de novo. **Harris v. Harris**, 988 So. 2d 376, 378 (Miss. 2008).

¶22. Skip argues that it was error for the court to order him to pay D'Anne $500 per month subsequent to their September 2009 property settlement agreement. He argues that the agreement between the parties trumps the temporary order on this issue, and that the court essentially modified the contract between the parties by ordering Skip to pay the $500.[6] The

_____

[6] D'Anne's argument that Skip's appeal on this issue is waived is without merit. While it is true that Skip did not raise this issue in his motion for new trial, an appeal of a ruling enforcing a temporary order, a ruling that the final judgment terminated, is clearly not

11

chancellor appears to have based his decision purely on equity, and did not engage in contract interpretation.[7]

¶23. An agreement made between the parties should ordinarily be enforced, and the court should take a dim view of efforts to modify or reform the parties' settlement agreement. *Williams v. Williams*, 37 So. 3d 1171, 1174 (Miss. 2010).[8] Thus, since the court in this case found that the settlement agreement between D'Anne and Skip was a valid contract, it should not modify anything decided by that agreement. Contract interpretation involves a three-step analysis. *Epperson v. Southbank*, 93 So. 3d 10, 16-17 (Miss. 2012); *Harris*, 988 So. 2d at 378-79. "First, [this Court] must determine whether the contract is ambiguous, and if it is not, then it must be enforced as written." *Epperson*, 93 So. 3d at 16. In this step, the Court analyzes the express wording of the contract and enforces the plain meaning where there is no ambiguity. *Id.* at 16-17. If the contract is deemed ambiguous, the Court applies the meaning more favorable to the nondrafting party. *Id.* at 17. Third, if the contract's meaning remains ambiguous, the Court will consider extrinsic evidence. *Id.*

_____

an appropriate issue to raise in a motion for new trial, as the issue was not addressed in the trial and had no bearing on the outcome of the trial. Furthermore, the court's order enforcing the temporary order was not a final judgment, and thus would have been interlocutory and not appealable to this Court. *See Michael v. Michael*, 650 So. 2d 469, 471 (Miss. 1995).

[7]However, this Court may affirm the chancellor if he reached the correct result, even if he reached that result for the wrong reason. *Knight v. Knight*, 85 So. 3d 832, 838 (Miss. 2012).

[8]Courts may modify property settlement agreements under certain circumstances, for example, where fraud, overreaching, or mistake are involved; however, absent special circumstances, courts should be hesitant to modify a property settlement agreement, as they would with any contract. *Speed v. Speed*, 757 So. 2d 221, 224-25 (Miss. 2000).

12

¶24. Before examining the contract, this Court must determine the nature of the $500-per-month obligation. The record reveals differing views on whether the $500 was termed temporary alimony or some unknown type of support based on D'Anne's contribution to the business. The $500 per month was for the purpose of supporting D'Anne, due to a sudden lack of income that was directly attributable to her separation from Skip. Regardless of whether Skip was to pay her from funds from the business or other funds, he was ordered to pay her this money for her support.[9] In substance, this award was for temporary alimony.

¶25. Turning to the property settlement agreement, D'Anne and Skip specifically and unambiguously left an alimony determination to the court, thus the agreement explicitly reserved the continued applicability of the $500 a month under the temporary order to decision of the court. The chancellor, to whom decisions regarding alimony was reserved, determined that equity demanded the $500 per month continue under the temporary order that was still in effect, given that Skip had not performed his contractual duties.[10] Therefore, the trial court did not err in ordering that Skip continue to pay the $500 per month under the

---

[9]Alimony is rooted in the traditional marital duty of support, and has more recently evolved to assist a dependant spouse in becoming self-supporting. Deborah H. Bell, *Mississippi Family Law* §§ 9.01[1], 9.01[2][c] (2005).

[10] We note that in most circumstances, "[t]o amend a prior decree, even if a temporary one, the parties hereafter should recite the change and present the same to the Court, otherwise we are in the inexplicable position of having an order of the Court changed by the parties without consideration for or by the Court." *Lewis v. Lewis*, 586 So. 2d 740, 743 (Miss. 1991). Furthermore, the temporary order specifically stated that Skip was to pay D'Anne the $500 per month "until further Order of this Court." No final divorce order or order otherwise approving the parties' property settlement agreement was entered until 2011, approximately one and a half years after the parties entered the property settlement agreement. Because the parties failed to explicitly address an obligation specifically ordered by the court, a fair interpretation of the agreement between the parties is that it did not alter the obligations of the temporary order, especially absent any order of the court.

temporary order where alimony was contractually left to the court to determine and continuing the obligation was equitable under the circumstances.

¶26.    The chancellor's decision to enforce Skip's obligation to pay D'Anne $500 per month under the temporary order, even after the agreement of the parties, is not error because the $500 per month was temporary alimony and the agreement specifically left a determination of alimony to the court.

**CONCLUSION**

¶27.    The chancellor in this case was not manifestly wrong or clearly erroneous, nor did he apply a clearly erroneous legal standard.  Because the lump-sum alimony award is supported by the evidence and the chancellor's findings, the temporary alimony award was contractually left to the chancellor to determine and was equitable, and the decision to award interest on the net unaccomplished obligations was not manifestly wrong, this Court affirms the trial court.

¶28.    **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. COLEMAN, J., NOT PARTICIPATING.**