# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CC-00165-SCT

*MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY, MISSISSIPPI
DEPARTMENT OF ENVIRONMENTAL QUALITY
AND MISSISSIPPI ENVIRONMENTAL QUALITY
PERMIT BOARD*

*v.*

*BELL UTILITIES OF MISSISSIPPI, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/08/2013 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |
| ATTORNEYS FOR APPELLANTS: | LISA THOMPSON OUZTS |
| | ROY FURRH |
| ATTORNEY FOR APPELLEE: | KATHRYN H. HESTER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED IN PART; VACATED IN PART |
| | AND RENDERED - 04/10/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Lawrence Elliott owned and operated the Black Creek Water and Wastewater systems in Forrest County from the 1990s until 2005. The systems are a few miles upstream of an area of Black Creek that is designated as a National Wild and Scenic River. Under Elliott's ownership and operation, the systems suffered numerous violations of environmental regulations, including multiple illegal sewage discharges. Bell Utilities purchased the

systems from Elliott in 2005 and vastly improved the situation, expending its own money in an attempt to bring the system into compliance. In this vein, Bell entered into an Agreed Order with the Mississippi Department of Environmental Quality in which compliance issues were addressed, and in which Bell agreed to put up a $20,000 financial assurance that would be returned to Bell after two years of adequate compliance. In 2010, Bell sought to sell the Black Creek systems to Utility One, LLC, and to transfer the attendant permits to it. MDEQ refused to transfer Bell's wastewater permit to Utility One unless Utility One put up a $20,000 financial assurance. Bell appealed the denial of the permit transfer to the chancery court. The chancery court reversed the Permit Board, finding that its actions were arbitrary and capricious because it has not promulgated regulations on how to conduct a regulatory hearing and on when and whether to demand financial assurances prior to permit transfer. It ordered MDEQ and the Permit Board to promulgate such regulations. MDEQ appeals to this Court. Because this Court finds that the Permit Board's demand of $20,000 from Utility One to transfer the permit was beyond its power, this Court reverses and renders the Permit Board's denial of the permit transfer, thus affirming the portion of the chancery court judgment that reverses the Permit Board. However, because the agencies are not required under the APA to promulgate rules and regulations for formal Permit Board hearings, we vacate the portion of the trial court's judgment that requires them to do so.

## FACTS AND PROCEDURAL HISTORY

¶2. Several state agencies are involved in this case. The Mississippi Commission on Environmental Quality ("Commission") is the agency tasked with carrying out the state's policies preventing, controlling, and abating pollution of the State's air and waters by

2

enforcing pollution control laws and regulations and any permits issued by the Permit Board. The Mississippi Environmental Quality Permit Board ("Permit Board") has the power to take action on permits administered through MDEQ. The Mississippi Department of Environmental Quality ("MDEQ") is tasked with providing technical assistance and support to the Commission and Permit Board, and its duties include conserving, managing, developing, and protecting the State's natural resources. The duties of the Mississippi Department of Health ("MSDH") include regulating drinking water systems. The Mississippi Public Service Commission ("PSC") regulates water and sewer utilities, specifically rates, service, and whether the facilities are required for the convenience and necessity of the public.

¶3.    The "Black Creek System" consists of a water treatment system and a wastewater system, and is located in Forrest County[1] on the Black Creek. Black Creek is a state scenic stream, and a portion downstream from the Black Creek System is designated as a National Wild and Scenic Stream. 16 U.S.C. § 1274(a)(59); Miss. Code Ann. § 51-4-23.4 (Rev. 2003). Lawrence Elliott constructed the Black Creek System to service developments in the area.

¶4.    During his ownership, Elliott committed many compliance violations. MDEQ also received an "inordinate" number of citizen complaints for the Black Creek System under Elliott's ownership. All in all, Elliott's numerous violations and pervasive non-compliance

---

[1]Confusingly, many key documents in the record indicate that the system is in Lamar County, while others indicate that it is in Forrest County. At oral argument, the parties conceded that the system is in Forrest County and that documents to the contrary are mistaken.

resulted in poor to nonexistent service to residents and numerous illegal sewage discharges. Because Elliott refused to make needed repairs, MDEQ was forced to expend over $63,000 from the Pollution Emergency Fund to keep the system operable and to protect the citizens and the environment.

¶5.     Because of the dire situation at Black Creek caused by Elliott, the PSC began looking for someone to purchase the Black Creek System.  The PSC approached Bell and asked Bell to consider purchasing the system.   Bell ultimately agreed and purchased the Black Creek System.

¶6.     In late 2004, the Commission, MSDH, and Bell entered into an Agreed Order regarding the Black Creek System in anticipation of Bell's impending purchase of the Black Creek System from Elliott.  The Agreed Order noted that the system was "not in compliance with applicable permits, certificates, and federal and state laws and regulations" and that "Bell has committed to operate the . . . System and cause . . . [it] to achieve compliance with all federal and state laws and regulations, and permits."  The purpose of the Agreed Order was to bring the Black Creek System into compliance, by giving Bell time and help to bring the extremely troubled system into compliance.  It also outlined some of Bell's specific obligations to the end of achieving compliance.

¶7.     The Agreed Order provided that any sale or conveyance of the Black Creek System would not relieve Bell of its obligations under the order:

> [n]o change in ownership, corporate, and/or partnership status relating to the [Black Creek] System that is covered by this Agreed Order will in any way alter the responsibilities of Bell under this Agreed Order.  In the event of any conveyance of easement, or other interest in the [Black Creek System], . . . all

4

of Bell's obligations under the Agreed Order shall remain in full force and effect and shall continue to be met.

However, the agreement did provide that if a private party acquired the Black Creek System, "*and the acquisition is approved by the appropriate regulatory authority(s)*", then Bell's responsibilities under the Agreed Order would be relieved upon the transfer of all necessary permits to the new owner. (Emphasis added). Later in the same paragraph, the Agreed Order provided merely that "Bell shall *notify* the Agencies in the event of any such conveyance." (Emphasis added). The Agreed Order further provided that "[a]ny deed, title, or other instrument of conveyance executed by Bell that transfers title to any part of the [Black Creek System] shall contain a notice that the [Black Creek System] is the subject of this Agreed Order." The financial assurance provision of the Agreed Order stated that "Bell shall provide financial assurance of $20,000 . . . The financial assurance shall be secured within thirty days from obtaining all necessary permits from the Permit Board. Bell shall continue to provide this financial assurance for a period of two years at which time the requirement shall cease if Bell demonstrates an adequate compliance for the duration of the two-year period." The Agreed Order noted that if Bell and MDEQ do not agree on the adequacy of the compliance record, the matter should be taken before the Commission for a determination. The adequacy of the compliance was to be determined by the forfeiture provisions of Mississippi Code Section 49-17-44(2).[2]

---

[2]Section 49-17-44(2) provides that
The commission may enter an order requiring forfeiture of the bond or other financial security, if the commission determines that:
(a) The continued operation or lack of operation and maintenance of the facility . . . represents an imminent threat to the public health, welfare and the

5

¶8.    Bell ultimately took control of the Black Creek System on January 7, 2005. MDEQ inspected the system fairly regularly. While early inspections in 2005 indicate some significant problems, ostensibly due to the state of disrepair the system was in when Bell acquired it, inspections by 2006 indicated that the system was much improved regarding compliance. Moreover, one 2005 inspection noted that erosion seemed to be a continuing issue for the site, and that an entirely new system could be constructed at a different location for what it would cost to permanently fix the erosion issue. It indicated that erosion should continue to be fixed if and when it occurred.

¶9.    In 2008, Bell Utilities entered into negotiations with Ni-America to sell them the Black Creek System. Bell worked with MDEQ regarding the prospective sale. On July 1, 2008, Bell wrote to MDEQ requesting that MDEQ find that Bell had satisfied the requirements and obligations of the Agreed Order. On July 8, 2008, MDEQ inspected the Black Creek System "[t]o determine the facility's compliance with [the] Agreed Order." The inspection report concluded that "[o]verall the site was in satisfactory operating condition and appears to have met the conditions set forth in the Agreed Order regarding the collection system." On August 7, 2008, Bell transmitted the $20,000 financial assurance to MDEQ to satisfy the Agreed Order, noting that "we anticipate closing [with Ni-America] in the next

---

environment because the permittee is unable or unwilling to adequately operate and maintain the facility or the facility has been actually or effectively abandoned by the permittee;
(b) Reasonable and practical efforts under the circumstances have been made to obtain corrective actions from the permittee; and
(c) It does not appear that corrective actions can or will be taken within an appropriate time as determined by the commission.

day at which time we will discuss the release of these funds in regards to Ni-America assuming the responsibilities for Black Creek Utility." The financial assurance was submitted over three years after the submission date contemplated by the Agreed Order.

¶10. On August 11, 2008, Trey Smith, a Senior Attorney with MDEQ, sent Bell a letter regarding the Agreed Order. The letter stated that it was "MDEQ's written notice that Bell Utilities of Mississippi, LLC . . . has appeared to satisfy and complete the outstanding requirements and obligations of Agreed Order 4928-04 within the authority of the Mississippi Commission on Environmental Quality . . . ." The letter further noted that an inspection of the Black Creek System was performed on July 8, 2008 "at which time the facility was found to be in compliance with the conditions of Agreed Order No. 4928-04." It stated that "[t]he requirements of the Order appear to have been completed and *no further action by Bell regarding Agreed Order No 4928-04 will be required by the Commission or MDEQ*." (Emphasis added). The letter also confirmed that MDEQ was in receipt of Bell's $20,000 financial assurance. It then informed Bell that "[i]n the event that Bell sells, assigns and/or otherwise transfers title and/or control of Black Creek Retreat, the financial assurance of $20,000 provided . . ., upon the Commission receiving satisfactory replacement financial assurance from the acquiring party, shall be returned to Bell . . . or if alternative financial assurance was provided all rights and interests in such financial assurance shall be immediately terminated." It concluded that the letter did not limit the rights of MDEQ "for future violations of environmental laws, rules, regulations and permit conditions." The sale of the Black Creek System to Ni-America fell through shortly thereafter.

¶11.   MDEQ inspected the Black Creek System again on August 4, 2009.  MDEQ noted a few violations, notably that access to the lagoon was not restricted, significant erosion had occurred at the bottom of the levee, and four-wheeler trails were on the levee and such activity should be prevented.

¶12.   In 2010, Bell and Steve Womack[3], the operator of the Black Creek Systems since 2008, began discussing selling the Black Creek System to Womack's newly created company, Utility One.  On September 24, 2010, Bell and Womack requested that MDEQ transfer the permit from Bell to Womack.  The cover letter stated that "[t]he form indicates a closing date of November 1, 2010, but due to the need for . . . [PSC] approval, the final closing may occur at a later date. . . . Please review this information and call if there are any problems with the transfer or if you need additional information."[4]  On December 6, 2010, counsel for Bell exchanged emails with Harry Wilson of MDEQ regarding the transfer, and Wilson stated that MDEQ was looking into the issue and would get back to Bell shortly.

¶13.   On December 7, 2010, the PSC approved the sale of the Black Creek System to Utility One, including transferring Bell's Certificate of Public Convenience and Necessity to Utility One.  The PSC found that Utility One was "ready, fit, willing and financially able and intends in good faith to furnish reasonably adequate sewer service to all persons within Bell's certificated area that is being transferred."

---

[3]Womack was a Level IV Operator, who operated several wastewater systems in Mississippi.

[4]Bell apparently followed similar protocol with the MSDH, which requested that Bell and Utility One enter into a new Agreed Order covering the water system.  Bell and Utility One did enter such an order on December 6, 2010.

¶14. On December 13, 2010, Bell again wrote to MDEQ requesting that it facilitate the permit transfer. It noted that the transfer to Utility One was scheduled to close on December 14, 2010.[5] MDEQ and Bell continued to go back and forth about the transfer and the $20,000 during January, February, and March of 2011. MDEQ informed Bell that it would require financial assurance from Utility One before recommending or approving the permit transfer. Roy Furrh, MDEQ General Counsel, admitted that Bell dealt with the conveyance to Utility One in the "normal regulatory way," but indicated that, because of the Agreed Order, that was not sufficient.

¶15. On January 28, 2011, MDEQ inspected the Black Creek System. The inspection concluded that the lagoon should have a level measuring device installed, vegetation overgrowth around the lagoon should be cut, the effluent pipe from the filter-box should be repaired, and all manholes and pump stations should have covers in place. The inspection also noted that the levee had "no apparent problems, nor any sign of recent overflows into the surrounding area."

¶16. On August 11, 2011, Bell filed a petition for a writ of mandamus in Hinds County Chancery Court, requesting that the court require that MDEQ return Bell's $20,000 financial assurance and transfer Bell's NPDES permit to Utility One. MDEQ represented in chancery court that it would transfer the permit if Utility One provided the $20,000 in financial assurance. On September 26, 2011, the Hinds County Chancery Court ordered MDEQ "to submit the matter to the Permit Board for a transfer request at the October 11, 2011, Permit Board meeting with comments by Bell Utilities and other interested parties as allowed under

---

[5]The transfer did ultimately occur.

9

current Permit Board statutes." It further ordered that, if the Permit Board denied the transfer, Bell must be given an evidentiary hearing before the Permit Board on or before December 13, 2011." It stated that if the Permit Board denied the transfer, Bell may return to the chancery court to appeal the decision.

¶17. At its October 11, 2011, meeting, the Permit Board denied Bell's request to transfer the permit to Utility One. It noted that "MDEQ staff informed Bell and Utility One that MDEQ would not recommend the issuance of the permit transfer and release of the $20,000 in financial assurance provided by Bell until substitute or alternate financial assurance was provided." Bell therefore requested an evidentiary hearing. On October 18, 2011, Furrh sent Bell and Womack a letter attaching the Permit Board hearing procedures and outlining a schedule. Furrh's letter stated that the law "is not clear regarding the authority of a party other than the hearing petitioner to participate in an evidentiary hearing without the express authority of the Permit Board. . . . If Utility One, LLC would also like to participate in the hearing, I suggest that it file a Motion to Intervene with the Permit Board. . . . Requiring parties to file Motions to Intervene in similar circumstances is standard procedure with the Permit Board." Permit Board procedure required that all direct and rebuttal testimony must be pre-filed, and that parties may call "adverse" witnesses without submitting pre-filed testimony. Bell filed an objection to the Permit Board's procedures on November 17, 2011, arguing that the Permit Board has failed to formally promulgate rules and regulations governing a formal hearing and challenging the requirement that direct and rebuttal testimony must be pre-filed. The Permit Board Hearing Officer overruled Bell's objections in a December 8, 2011, order. She found the Permit Board statute regarding the

10

promulgation of regulations permissive in nature and concluded that the Permit Board's long-standing procedures, which apply equally to all parties and aid in administrative efficiency, were not arbitrary and capricious.

¶18. On November 16, 2011, MDEQ again inspected the Black Creek System, with the stated purpose of rebutting Bell's pre-filed testimony for the evidentiary hearing. The inspection found the following alleged violations: 1) several manhole concrete lid ring collars were cracked or unsealed; 2) one electrical power outlet at one lift station was unprotected; 3) the level-measuring device in the lagoon did not clearly indicate the depth of the lagoon; 4) the lagoon had some vegetation growth around it; 5) the lagoon levee had "significant erosion near the toe of the levee and spanning its entire length" and there was an "absence of established vegetative stabilizing cover on this particular levee"; and 6) while the entrance to the lagoon access road was fenced, the lagoon perimeter was not secured.

¶19. The Permit Board held an evidentiary hearing on the matter of Bell's permit transfer request on December 13, 2011. At the hearing's outset, Womack asked to participate in the hearing by offering testimony and evidence and cross-examining witnesses. MDEQ objected, and the Hearing Officer sustained the objection, thus denying Womack the ability to participate in the hearing as an interested party.[6]

¶20. In the opening argument for MDEQ, Furrh stated that "MDEQ recommends the proposed transfer of the state operating permit from Bell to Utility One, LLC be denied unless or until Bell and Utility One agree to provide $20,000 in financial assurance to protect

_____

[6]Womack did testify as a witness, called by Bell.

11

this extraordinary system." MDEQ called Harry Wilson[7] and Michael Freiman[8] to testify, as they had performed the November 16, 2011 inspection at the Black Creek System. Both testified that Bell had compliance problems and that Utility One should put up financial assurance in order for the permit to be transferred. When asked how MDEQ calculated the amount of $20,000 as applied to Utility One, Wilson testified that "I don't have a calculation. I think it was a number that was fair. It's a number that seemed reasonable from what we'd seen out there in the past couple of years. But there's not a calculation, so to speak." The hearing and attendant evidence primarily centered around issues of compliance, the $20,000, and the Agreed Order. MDEQ emphasized the erosion issues found in the November 2011 inspection. Furrh closed MDEQ's case recommending that "the permit be denied until financial assurance is provided."

¶21. The hearing concluded with one of the board members unequivocally stating that he would vote to approve the transfer if Utility One agreed to provide $20,000 in financial assurance, and would vote to deny the transfer if Utility One did not agree to give the $20,000 financial assurance. The Permit Board then voted three to two to deny the transfer of the permit. On March 13, 2012, the Permit Board adopted its Findings of Fact and Conclusions of Law (FOFCOL) regarding its denial of the permit transfer. The Permit Board found that the erosion issues were "significant and constitute an imminent danger to Black Creek." It further found that the erosion issues had not been adequately nor permanently

[7]Wilson was the chief of the environmental permits division of MDEQ.

[8]From 2007 to November 2011, Freiman was the chief of the municipal and private facilities branch within the permit division of MDEQ. Beginning in November 2011, he held the position of chief of the surface water division at MDEQ.

12

addressed. The Permit Board noted that "transfer from a permittee with financial assurance to a never-before-permitted entity which will not agree to provide financial assurance should be denied." It concluded that "it is entirely reasonable for the Permit Board to deny transfer of the permit unless and until Bell or Utility One brings the Black Creek System into compliance and provides $20,000 in financial assurance, as required by the Agreed Order, to protect this extraordinary and precious resource." The Permit Board concluded that the financial assurance is a "continuing obligation that binds the Black Creek system until the Commission finds that all obligations under its Agreed Order have been met." It also determined that "the ongoing compliance issues, including the levee erosion, and noncompliance with the Agreed Order, constitute a relevant basis to deny the transfer."

¶22. Bell appealed the Permit Board's decision to deny the transfer to the Hinds County Chancery Court. MDEQ then moved to transfer venue to the Forrest County Chancery Court. The court granted MDEQ's motion, and the appeal proceeded in the Forrest County Chancery Court. The arguments were fully briefed at the chancery court level, with the chancery court sitting as the appellate court. The chancery court found that the Permit Board's operation without formal rules and regulations allowed it to yield "unbridled authority" and thus the operation was arbitrary and capricious. It then reversed and remanded the denial of the permit transfer and ordered the Permit Board to promulgate rules and regulations regarding financial assurances. Bell then moved to amend the court's order, and its motion was granted. The court amended its order to reverse and remand the denial of the permit transfer and ordered MDEQ and/or the Permit Board to promulgate rules and regulations under the Mississippi Administrative Procedures Act ("APA") for the Permit

13

Board's formal hearings. It further stated that "[i]f the Permit Board wishes to require financial assurance for wastewater systems such as the Black Creek Wastewater Treatment Facility, then the Commission on Environmental Quality must first promulgate the rules and regulations required by Miss. Code Ann. § 49-17-44."

¶23. Aggrieved, MDEQ appeals to this Court, arguing that: 1) the APA does not require the Permit Board to promulgate hearing procedure regulations for its formal hearings; 2) the lack of promulgated hearing procedures does not violate due process; 3) the financial assurance for the Black Creek System was governed by the Agreed Order, in that the "financial assurance is a continuing obligation that binds the Black Creek System until the Commission finds all obligations under the Agreed Order have been met;" and 4) the chancery court used the wrong standard of review and failed to give proper deference to the Permit Board.

## ANALYSIS

### Standard of Review

¶24. At the chancery court, Permit Board matters "shall be affirmed" "[i]f no prejudicial error is found." Miss. Code Ann. § 49-17-29(5)(b) (Rev. 2012). "If prejudicial error is found the decision of the board shall be reversed and the chancery court shall remand the matter to the Permit Board for appropriate action as may be indicated or necessary under the circumstances." *Id.* Appeals are to be considered only on the record as made before the Permit Board. *Id.*; *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 677 (Miss. 2006). This Court reviews the matter under the same standard as does the chancellor in his or her review. *Sierra Club*, 943 So. 2d at 677. Matters of law are to be reviewed de

14

novo, giving great deference to an administrative agency's construction of its own rules and regulations and the statutes under which it operates. *Id.* at 678 (quoting *McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999)). "Therefore, an agency's decision will not be disturbed on appeal absent a finding that it (1) was not supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party." *Sierra Club*, 943 So. 2d at 678 (quoting *McDerment*, 748 So. 2d at 118). Substantial evidence is something more than a scintilla of evidence, yet less than a preponderance of the evidence. *Sierra Club*, 943 So. 2d at 678. Further, "[a]n action is arbitrary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotations omitted). "A rebuttable presumption exists in favor of agency decisions, and this Court may not substitute its own judgment for that of the agency."[9] *Id.*

_____

[9]Bell argues that this Court should review the agency's decision de novo because MDEQ, Bell's adversary in the formal hearing, authored the Permit Board's FOFCOL. However, this Court recently rejected the argument that factual findings should be reviewed under any sort of "heightened scrutiny," even if they are adopted verbatim from a party's proposed findings of fact. *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 156-57 (Miss. 2011). However, "should a party suspect and suggest that the judge's factual findings are somehow tainted or untrustworthy, we hold that the party – upon proper proof – may seek a new trial." *Id.* at 157. Likewise, if the Permit Board's factual findings appear tainted or untrustworthy, this Court may find that the Permit Board's findings are not supported by substantial evidence and/or are arbitrary and capricious, upon proper proof.

*Financial Assurance*[10]

¶25.    MDEQ argues on appeal that "[t]he Permit Board denied transfer because of unresolved compliance issues."  While the Permit Board certainly considered compliance issues, as it had every right to do,[11] the record makes abundantly clear that the Permit Board's decision was not based solely, or even primarily, on compliance issues.  MDEQ and the Permit Board made it abundantly and unequivocally clear that, notwithstanding the compliance and other issues, the permit would have been transferred had Utility One provided $20,000 in financial assurance.[12]  MDEQ also argues that the $20,000 and the compliance issues are intertwined because the Agreed Order and its financial assurance provision apply to the Black Creek System, and thus apply to Utility One.  Bell argues that the $20,000 financial assurance in the Agreed Order applies only to Bell and that the Permit Board has no authority to demand $20,000 from Womack in exchange for agreeing to transfer the permit.

---

[10]The parties concede that whether MDEQ should return Bell's $20,000 is not at issue in this appeal.

[11]The Permit Board may make permitting decisions "based upon any information as it deems relevant."  Miss. Code Ann. § 49-17-29(3)(c).  Further, "[i]n considering an application for a permit issuance or transfer, the Permit Board may consider the applicant's compliance history, financial capability, financial responsibility, or any other aspect of the applicant's history it deems necessary or appropriate."  11 Miss. Admin. Code Pt. 6, 1.1.3(H)(1).

[12]The record contains more than twenty statements by MDEQ and the Permit Board that, notwithstanding compliance or any other issues, the permit would be transferred if Utility One gave them $20,000 in financial assurance.  Moreover, at oral argument, MDEQ admitted that it communicated to Bell that it would agree to the transfer if only Utility One would provide $20,000 in financial assurance.

16

¶26. The Permit Board may require financial assurance from applicants. Miss. Code Ann. § 49-17-44(1) (Rev. 2012). However, "[t]he commission *shall* establish by regulation the acceptable forms of financial security and the amount of financial security required for the various types and sizes of facilities." *Id.* (emphasis added). The Commission has not established financial assurance regulations for wastewater treatment systems, thus, as a general matter the Permit Board cannot require financial assurance from an applicant such as Utility One. MDEQ concedes this point. Therefore, whether the Permit Board has the authority to demand $20,000 from Utility One as a condition of the transfer depends upon whether the financial assurance provision of the Agreed Order applies to Utility One because the Agreed Order applies to the System, not to the particular parties.

¶27. The Agreed Order is essentially a contract in nature. Contract interpretation involves three steps. *McFarland v. McFarland*, 105 So. 3d 1111, 1119 (Miss. 2013). First, a court must determine whether the contract is ambiguous by analyzing the express wording. *Id.* If it is not, the plain meaning is enforced as written. *Id.* Second, if the contract is ambiguous, the Court applies the meaning more favorable to the nondrafting party. *Id.* Third, if the contract's meaning remains ambiguous, the Court may consider extrinsic evidence. *Id.*

¶28. The Agreed Order states that it is between Mississippi Commission on Environmental Quality, the Mississippi State Department of Health, Bell, and Elliott. Neither Utility One nor Womack are signatories. The Agreed Order further goes to great pains to declare that no change in ownership of the system will relieve *Bell* of its duties under the Order. This provision indicates that the Agreed Order applies to and follows Bell, and does not follow

17

the Black Creek System. On the other hand, the Agreed Order states that "[a]ny deed, title, or other instrument of conveyance executed by Bell that transfers title to any part of the STP or DWP shall contain a notice that the STP and/or DWP is the subject of this Agreed Order."[13] However, this provision appears simply to the purpose of placing purchasers on notice, not to obligate a nonsignatory to the contract. In the same paragraph, the order provides that *if* any acquisition of the system is approved by MDEQ, only then shall Bell be relieved of responsibility under the order.[14] This language also supports the notion that the responsibilities under the order are Bell's, but do not follow the system.

¶29. The Agreed Order's express purpose is "to cause the STP and DWP to *achieve* compliance with all federal and state laws and regulations." (Emphasis added). The Agreed Order goes on to provide a detailed list of action items that Bell must complete and the time periods in which Bell must complete them. This language indicates that, once Bell has achieved compliance as contemplated by the order, the order is no longer in effect.

¶30. The financial assurance provision of the Agreed Order states that "Bell shall provide financial assurance of $20,000 . . . The financial assurance shall be secured within thirty days

---

[13]The next line of the order states that "Bell shall *notify* the Agencies in the event of any such conveyance." (Emphasis added). MDEQ seems to interpret this line to mean that Bell required MDEQ's permission to convey title, thus partially justifying the transfer denial. Bell clearly notified MDEQ about the conveyance. This sentence plainly does not require prior permission before Bell is allowed to transfer title, but merely requires that MDEQ be notified.

[14]MDEQ also attempts to use this portion of the Agreed Order to justify denying the permit transfer, seemingly arguing that Bell is required to obtain MDEQ permission for a sale in order to have the permit transferred. This assertion belies the plain language of the order. The only thing affected by whether Bell obtains agency approval for the sale is whether Bell remains liable under the Order or not. It has no bearing on permit transfer, simply on Bell's contractual liability.

from obtaining all necessary permits from the Permit Board. Bell shall continue to provide this financial assurance for a period of two years at which time the requirement shall cease if Bell demonstrates an adequate compliance for the duration of the two-year period." The Agreed Order goes on to provide that if Bell and MDEQ do not agree on the adequacy of the compliance record, the matter will be taken before the Commission for determination.[15] This indicates that the financial assurance provision is specific to Bell. The Agreed Order clearly obligates its signatories, but does not follow the system.

¶31. The Agreed Order plainly does not apply to Utility One, a nonsignatory. Therefore, denying the permit transfer because of the lack of financial assurance from Utility One is beyond the power of the Permit Board, because the Commission has not promulgated financial assurance regulations for wastewater systems. The record makes clear that the $20,000 was the reason for denying the transfer – MDEQ and the Permit Board made multiple statements that they would transfer the permit for $20,000 notwithstanding any of the other issues.

¶32. We therefore affirm the portion of the chancery court's judgment that reversed the Permit Board, and we reverse and render the Permit Board's decision to deny the permit transfer, and effectuate the transfer to Utility One. The Permit Board and MDEQ clearly

---

[15]While Bell clearly requested its $20,000 be returned, and Bell and MDEQ clearly disagree about the adequacy of the compliance record, it does not appear that the "matter" of the return of the $20,000 and "adequate compliance" has been "taken" before the Commission for a final determination. Thus, it seems that the issue of whether the Agreed Order has been completed is as yet undetermined.

found that Utility One was an acceptable permittee[16] and clearly would have transferred the permit to it had it put up the $20,000. Since the $20,000 was beyond the Permit Board's authority to demand, and since it was the lone impediment to transferring the permit, we find reversing and rendering the Permit Board to be the appropriate resolution.

***Whether the Permit Board is required to adopt regulations to govern its formal hearings under the Administrative Procedures Act.***

¶33. The APA requires that all agencies "[a]dopt rules of practice setting forth the nature and requirements of all formal and informal proceedings available to the public." Miss. Code Ann. § 25-43-2.104(b) (Rev. 2010). However, the law notes that "[s]pecific statutory provisions which govern agency proceedings and which are in conflict with any of the provisions of this chapter shall continue to be applied to all proceedings of any such agency to the extent of such conflict only" and that "to the extent that the provisions of any other law *conflict or are inconsistent* with the provisions of this chapter, the provisions of such other law shall govern and control." Miss. Code Ann. § 25-43-1.103(3)&(4) (Rev. 2010) (emphasis added). The Permit Board statute provides that "[t]he Permit Board *may* adopt rules of practice and procedure governing its proceedings that are consistent with the commission's regulations." Miss. Code Ann. § 49-17-29(3)(d) (Rev. 2012) (emphasis added).

¶34. MDEQ argues first that the APA rule-making requirement applies to the "right of the public to review and comment upon proposed rules and regulations, or amendment or repeal

---

[16]We presume that if Utility One was an inappropriate permittee, the Permit Board and MDEQ certainly would not transfer the permit to it, even *with* a $20,000 financial assurance.

20

of the same, before the agency takes rule-making action." Second, it argues that, regardless of whether the APA applies to rules for adjudicatory hearings, the conflict of law provisions mandate that the specific Permit Board statute, which is permissive, trumps the APA. Bell argues that the plain language of the APA mandates that the Permit Board adopt rules and regulations for its "formal hearing," because such a "formal hearing" "is just such a formal proceeding for which this minimum procedural code was required."

¶35. We need not determine whether the Permit Board hearing is the type of proceeding to which the APA rule-making provision applies, because the conflict provision of the APA applies. Even if the APA applies to evidentiary proceedings, the specific statute of the Permit Board, which is in conflict and inconsistent with the APA, trumps the APA because that statute is clearly permissive, not mandatory. Thus, the Permit Board is not required by the APA to promulgate rules and regulations for its evidentiary hearings. To the extent the chancery court judgment ordered the Permit Board and MDEQ to promulgate rules and regulations for its formal hearings, it was in error, as the agencies are not required to do so under the APA.

***Whether the lack of promulgated hearing rules violated due process.***

¶36. Because this issue is capable of repetition, we write to note our concerns regarding it. Bell argues that the Permit Board's lack of rules and regulations are arbitrary and capricious because the lack thereof results in "ad hoc" procedures which do not allow for a fair and impartial hearing. "Administrative agencies must afford minimal due process consisting of notice and an opportunity to be heard." ***D.J. Koenig & Assocs., Inc. v. Miss. State Tax Comm'n***, 838 So. 2d 246, 254 (Miss. 2003). "Due process is flexible and calls for

21

such procedural protections as the particular situation demands." ***Mathews v. Eldridge***, 424 U.S. 319, 334 (1976).  To determine whether administrative proceedings provide proper due process, a court may examine 1) the private interest that will be affected, 2) the risk of erroneous deprivation of the interest through the procedures used and the probable value of additional or substitute procedural safeguard's, and 3) the government's interest, including the burden that additional or substitute procedural requirement would entail.  ***Id.*** at 335.  A full evidentiary hearing is not necessary to comply with procedural due process.  ***Id.*** at 334-35.

¶37.    The statute governing Permit Board hearings provides that "[a]t a hearing, *any* interested party may present witnesses and submit evidence and cross-examine witnesses."  Miss. Code Ann. § 49-17-29(4)(b) (Rev. 2012) (emphasis added).  An "interested party" is defined as "any person claiming an interest relating to the property or project which is the subject of the permit action, and who is so situated that the person may be affected by the disposition of that action."  *Id.*  Womack certainly fits this definition.  Roy Furrh stated in his letter to Bell that the law "is not clear regarding the authority of a party other than the hearing petitioner to participate in an evidentiary hearing without the express authority of the Permit Board. . . . If Utility One, LLC would also like to participate in the hearing, I suggest that it file a Motion to Intervene with the Permit Board. . . . Requiring parties to file Motions to Intervene in similar circumstances is standard procedure with the Permit Board."  However, the statute is clear that any interested party, not just the hearing petitioner, may participate in a formal hearing and does not need the express authority of the Permit Board to do so.  MDEQ's apparent lack of adherence to this statute is concerning.  MDEQ is put

22

on notice that, without formal rules and regulations, every proceeding before it may be subject to a claim of violation of some statutory or constitutional right of the complaining party.

## CONCLUSION

¶38. The judgment of the chancery court is affirmed in part, vacated in part, and rendered. Consequently, we reverse and render the Permit Board's decision to deny the permit transfer, thus effectuating the transfer of the permit to Utility One. To the extent the chancery court reversed the denial of the permit transfer and held that the Permit Board could not require financial assurance for wastewater systems in the absence of promulgated rules and regulations pursuant to Mississippi Code Section 49-17-44, we affirm. We vacate the portion of the chancery court judgment requiring the Permit Board to promulgate rules and regulations under the APA.

¶39. **AFFIRMED IN PART; VACATED IN PART AND RENDERED.**

**WALLER, C.J., RANDOLPH, P.J., LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶40. The majority recognizes that Bell suffered no due process violation, so any discussion or warning that MDEQ *"may be subject"* to a possible "claim of violation of some statutory or constitutional right" in some future case, is an advisory opinion. And because "it is not

23

within the province of this Court to render advisory opinions,"[17] I concur with the majority in part and result.

**COLEMAN, J., JOINS THIS OPINION**.

---

[17] ***Hughes v. Hosemann***, 68 So. 3d 1260, 1263 (Miss. 2011) (citing ***Sheldon v. Ladner***, 205 Miss. 264, 38 So. 2d 718, 719-20 (1949)).